## The Marie Anne.

### (District Court, E. D. Virginia. February 10, 1883.)

Salvage—Towage Services by Ocean Steamer—Yellow Fever—Compensation.
An ocean steamer worth $150,000, with a valuable cargo, and about 50 men, as crew and passengers, while running on schedule time from New York to Carthagena and other Caribbean ports, encountered a brig, in a practically helpless condition, about 130 miles off Cape Henry. Only three men were on the brig, the captain and the rest of the crew having died of yellow fever. It being considered unsafe to put men aboard her, the brig was towed into Hampton Roads, during a high and dangerous wind, the steamer deviating from her course about three days for that purpose. The brig and cargo were appraised at $7,645 as the auction value in Norfolk, which was much below their commercial value. Held, that $2,750 should be awarded as salvage in addition to the expenses incurred by the deviation.

In Admiralty. Libel for salvage services performed by the steamer Bellver and crew, in towing the brigantine Marie Anne into Hampton Roads. Decree for libelants.

The other facts fully appear in the following statement by Hughes, J.:

The steamer Bellver, Antonio Planas, master, left New York on the 18th of October, 1882, for Limon, Carthagena, and other ports on the Caribbean sea. At 6 o'clock on the morning of the 20th, she saw the Marie Anne, a French brigantine, showing signals of distress, and went to her. Most of the crew of the Bellver were Spanish, but Rossello, the first mate, spoke French. At the direction of the captain, Rossello spoke to those on board the Marie Anne in their own language. He asked them what they wanted. They replied, "We want to be saved." He asked if their captain was on board. They replied, he was dead. He asked if they had any navigator. They replied, "None," adding, "We are but three;" all the rest of the crew and the captain were dead. They requested to be taken on board the Bellver. When denied, they requested that their vessel and themselves should be taken into port. Their captain and the rest of their crew had died of yellow fever. The captain of the Bellver held a conference with his officers and passengers, and it was decided to tow them into port. They were then about 130 miles off the capes of the Chesapeake. The Bellver had on board a crew of 40 men, 7

cabin passengers, and probably other passengers. She had on a very valuable cargo, paying $5,000 in freight.

The brigantine had left San Domingo on the 16th of September, 1882, bound for Havre. She was a vessel of 222 tons. After having gone 300 leagues in the Atlantic, on her voyage, she had, on the 6th of October, changed her course, and had been making for Delaware bay ever since. The three men found on her, when met by the Bellver, had neither of them had the yellow fever. According to the testimony of the libelants, and of the health-officer at Norfolk, they were feeble, emaciated, and more or less ill. They had all, from necessity, remained on deck night and day nearly the whole of the time since leaving San Domingo. When hailed by the Bellver the principal sails of the brigantine were up, but were most of them torn, and were badly trimmed. The vessel and sails indicated the possible condition of the crew, though the ship herself was in a seaworthy and sound condition. They had a short time before hailing the Bellver hailed a sail-vessel, but had received no relief. The hawser with which the brigantine was first towed by the Bellver was one of her own, and soon broke under the growing power of the wind, which, already stiff, blew harder and harder for 15 to 20 hours afterwards. When the first hawser broke, two hawsers were used, both belonging to the brigantine; but about 11 o'clock of the night of the 20th the gale having become quite stiff and the sea quite heavy, both these hawsers broke. Afterwards, the Bellver used her own hawser in bringing the brigantine into Hampton Roads. During the night of the 20th, when the two ships had got separated, the Bellver kept near the Marie Anne until morning. The three men on board the latter, having taken heart since their rescue, managed their vessel very well during the night and the period of separation. The brigantine was brought into Hampton Roads on the 21st, and was anchored off Sewell's point. In a few days afterwards she was taken up to the quarantine station near Crany island. The health-officer of Norfolk, Dr. Galt, found two of the men feeble and sick, and anxious to be taken from their vessel to the city hospital; but he was unable to gratify them in this respect because of their vessel being infected with yellow fever. They seemed very anxious to leave her.

The testimony of the witnesses examined respectively for the steamer and the brigantine is conflicting as to the helplessness of the crew of the latter when she was hailed by the steamer, and as to the capacity of her crew to navigate their vessel. The crew of the brigantine were not examined until a month after their rescue, when they had recovered their health, strength, and courage. When first seen by Dr. Galt, the health-officer of Norfolk, they and their vessel were in condition corresponding to the representations of the witnesses examined for the Bellver. On arriving at Hampton Roads, and when the Bellver was about to leave them, they had signed for Capt. Planas, at his request, a testimonial in French, of which the following is a translation:

"We, the seamen of the brigantine Marie Anne, of St. Vaast, on a voyage from Saint Domingo to ———, certify that on the morning of the 20th of October, at six o'clock, we descried a steamer, and hoisted our flag, requesting

salvage assistance, [ 'sauvetage,' ] and said vessel, on seeing our signal, bore down upon us, and asked what we wanted, to which we replied, to take us aboard or to conduct us to port, since we had no navigator aboard, and did not know how to save ourselves and our vessel. However, we sign this certificate at the request of the captain of the said Spanish steamer Bellver, in the port of ———, where we arrived, conducted by this vessel, on the 22d day of October, 1882.

"The seamen of the brigantine,      The second of the Marie Anne, LE
      COUESPEL.                        MARCHAND."
      RASCHIERI.

In their testimony, given a month afterwards, in Norfolk, Le Marchand and Couespel, admitting that they had read and understood this testimonial before signing it, yet denied the truth of its statements. The tenor of their testimony is that they did not need assistance when taken in tow by the Bellver; that they could have easily brought their vessel into port; that at no time had they any thought of leaving her; that they were never in need of salvage service; that their vessel, its sails and rigging, were in good and effective condition; that they themselves were well and strong and hopeful; that Le Marchand was an experienced navigator, possessing a diploma as second mate from the college of St. Malo; that he had taken all necessary observations while the brigantine was at sea, and knew where his vessel was when rescued; and that they in fact, in hoisting a flag of distress and hailing the Bellver, had no purpose of asking for help and for salvage service, but wanted and asked for nothing but "onions, chickens, and vegetables." The alleged diploma of Le Marchand was not produced, though called for. Their testimony proves far too much in this direction; and I find myself unable to credit it on the two essential points,—whether their vessel needed salvage service, and whether they asked it of the Bellver. The testimony of the libelants and of circumstances is positive to the effect that the vessel was without a navigator; that her crew had no intelligent conception of where they were; that a heavy gale came on soon after she was taken in tow, in which she was likely to have been driven on the dangerous shore north and south of Cape Henry; that they earnestly asked to be taken on board the Bellver; that they required salvage service for themselves and vessel; and that they, owing to their own feeble condition, physical and mental, were in exigent need of it. The brigantine was insured in France for 40,000 francs, ($8,000.) She was appraised here under orders of this court at $4,000 as her value in Norfolk. Her cargo, which consisted of mahogany and other woods and some dried fruits, was assessed as worth $3,645.22 in Norfolk. A statement by items of the expenses of the Bellver incurred by deviation is filed by her counsel, showing these to have been $1,014.

*Butler, Stillman & Hubbard,* for libelants.

*Sharp & Hughes,* for respondents.

HUGHES, J., *(after stating the facts.)* This is admitted to be a case of salvage. An ocean steamer, the Bellver, bound from New York to a port within the tropics, having on board a large crew, a number of pas-

sengers, and a cargo paying a freight of $5,000, came in sight, on the morning of the 20th October last, of a sail-vessel holding out signals of distress. The steamer went to her relief and found that the vessel, which was the French brigantine Marie Anne, was infected with pestilence; that within a few days past it had lost all except three men of its crew with yellow fever, including its master; that it was floating upon the ocean without chart or navigator; and that it had shortly before been refused relief by another ship; that the three men left on her were practically impotent with long watching, fatigue, and despondency. These men begged to be taken on board the steamer. They demanded that at least their vessel and themselves might be saved, and taken into port. They had sailed from San Domingo, 300 leagues, for Havre, had then changed their course, and had now drifted to within 130 miles of Cape Henry. Counsel for libelants well say that here was a case worse than one of derelict. If it had been merely a ship abandoned and adrift, the master of the Bellver would have been at liberty either to put a crew upon her who might navigate her into port, or to leave her to her fate. But in this extraordinary case his duty as a sea-faring man forbade either of these measures. He had no right to put any of his own men upon a vessel infected with one of the most deadly of diseases, and one peculiarly fatal at sea. He could not abandon to their fate three worn-out, helpless human beings, begging to be saved. Nor could he take these poor people on his own ship, crowded as it was with men, and bound within the tropics, where, if the germ of yellow fever were once planted upon his ship, it would surely fructify in disease, and destruction to his business. I think the master of the Bellver adopted precisely the course imposed upon him by all the circumstances of the situation. In answer to the entreaty of the people on the Marie Anne to be taken on board his own steamer, he did what the authorities of Norfolk did three days afterwards, in answer to their petition to be admitted into the city hospital,—he refused. The protection of many from pestilence is a higher duty than that of gratifying even the moderate desires of a few who are afflicted. His refusal was an act of duty, and not an act of cowardice. The master of the Bellver, taking great care to protect his own vessel from infection, and declining to subject any of his own crew to risk by putting them on board the infected ship, did the only thing he could do with safety to his own vessel,—he towed the Marie Anne into Hampton Roads.

I cannot concur with Judge CURTIS in his opinion intimated in the case of The Alphonso, hereafter cited, that a person may safely go upon the deck of a ship infected with yellow fever, if he take care not to go below into the hold. Experience has shown that remaining at night on deck of such a vessel subjects to the contagion as surely as going below decks either by day or night. An historical proof of this fact was given in the instance of The Ben Franklin, which was the ill-fated steamer that brought the yellow fever to Norfolk in 1855. This ship, after being, as was thought, thoroughly cleansed and disinfected, and after lying for a while down in the Roads, took on wood from a lighter. Owing to a rainstorm,

which came on late in the afternoon, two laborers from the lighter slept overnight on the deck of the Franklin. This was their only exposure to the epidemic; but they took the fever, and both died, from this single night on the deck of what had been supposed to be a disinfected ship.

By deviating from his course in the manner which has been stated, the master of the Bellver incurred serious risk and cost. His own steamer was very valuable, as was also his cargo. The loss of three days' time to an ocean steamer running on a fixed schedule is always an important matter. Coming into any sort of contact with a vessel infected with yellow fever is most seriously perilous to a steamer plying within the tropics. Bringing a vessel in tow into the capes of the Chesapeake, under a high wind blowing upon the land, is a hazardous adventure to one not regularly navigating these waters. When we consider all these things, we cannot avoid the conclusion that the steamer Bellver subjected herself to serious peril and cost in undertaking this salvage service. As to the Marie Anne, she was found practically derelict. She had reversed her course in mid-ocean, after making a great part of her voyage, and had floated back before the winds for hundreds of miles. She had no chart. No one upon her deck knew where she was, except that it is probable that Le Marchand had an approximate apprehension of the latitude he was in. Her crew were too feeble and too emaciated or despondent even to trim sails. Most of the sails were torn, and all were hanging on the rigging in a slovenly manner, when the brigantine was spoken by the Bellver. Consequently, in the gale which soon after came on, she was in condition to be lost. It is absurd to contend that her voyage, before she was spoken by the Bellver, had demonstrated the proficiency of her crew as navigators. If it proves anything, it shows only that a vessel may live many days at sea adrift without a navigator. Le Marchand, the only man among the crew with any spirit remaining in him, had nothing but an ordinary map to guide him; but he could not have made any nautical use of it, as he did not know, until he was informed after he had got into harbor, that this map had on it the lines of longitude. It is certainly true that one person may take the longitude of a ship unassisted; but it is equally certain that Le Marchand had not performed this office at all while on board the Marie Anne.

I think it unreasonable to insist now that Le Marchand was a navigator. When first spoken by the Bellver, and especially and particularly asked whether she had a navigator on board, which was a most material inquiry, it was replied from the Marie Anne, with iteration, that she had not. After arriving in Hampton Roads, and when the Bellver was about to leave the brigantine, and her master naturally desired to take with him to his owners, from the saved crew themselves, evidence of the service he had taken the responsibility of deviating from his course to render them, Le Marchand, after reading a paper written in his own language, which he signed and asked his companions to sign, (who did sign it,) stated in this writing that the Marie Anne had no navigator on board. It was clearly an afterthought when, some weeks or more afterwards, he began to claim to be a navigator

vouching in proof a diploma from St. Malo, which has never been produced. Though I can readily conceive how the procurement of a certificate from a saved crew by salvors may, as a rule, deserve severe reprehension, yet I can see nothing in the tenor of the certificate which was obtained by the master of the Bellver from the crew of the Marie Anne, or in the circumstances under which it was obtained, to reprehend. It was but a brief record of what were, up to the day of its date, a few undisputed facts. Returning to the main subject in hand, I think the preponderance of chances were that the Marie Anne would have been lost and cast away on the dangerous coast above and below the Chesapeake capes, during the gale which prevailed on the day and night after she was taken in tow by the Bellver, if she had been left to herself. I think, therefore, this was a highly meritorious case of salvage; and I am restrained from allowing a maximum reward only by the circumstance of the comparatively small value of the subjects saved contrasted with that of the instruments which effected the salvage.

In respect to vessels found helpless at sea, there are two classes of cases of salvage,—one, in which the saving ship, usually a sail-vessel, puts one or more of her own crew on board, and leaves them to take the distressed vessel into port; and the other, in which the saving ship, being a steamer, herself takes the distressed vessel in tow, and carries her into port. Where the former expedient is adopted, the salvage allowed by the admiralty courts has not been as large, for obvious reasons, as in cases of the latter class. But when the latter method has been pursued, the salvage awarded has usually been large, sounding in thousands of dollars or pounds sterling. It may be remarked also, as to salvage cases which have been decided in the English high court of admiralty in later years, that the old rule of adjusting the amount of the award by proportions or percentages of the values saved has been more and more disregarded; and I think it may now be assumed that the rule is in England obsolete. I admit, however, that in the United States we are still bound to pay a sort of conventional deference to it. The tendency, nevertheless, here, as well as in England, is to cut loose from the old Procrustean rule, and to award as salvage—*First*, the amount due on the principles of *pro opere et labore* and *quantum meruit*; and, *second*, to add to this a reward graduated to the circumstances of each particular case; this reward or bounty being diminished from a generous amount only in cases where the value saved is exceptionally small compared with the values employed in the salvage, and the merit of the service rendered.

In the case of *The Janet Mitchell*, Swab. 111, the award was £1,200 ($6,000) for furnishing a navigator to a distressed ship. In the case of *The Roe*, Swab. 84, the award was £200 ($1,000) for supplying additional seamen to a ship disabled by being short of hands. In the case of *The Golondrina*, L. R. 1 Adm. & Ecc. 334, the award was £1,800 ($9,000) for furnishing a navigator to go from Chili to Swansea. In the case of *The Alphonso*, 1 Curt. 376, where two vessels were off shore, and one of them supplied a seaman to the other to bring her a few miles into port,—yellow fever being on board the latter,—the award was $750,

and would have been increased to $1,050 if the master who furnished the seaman had been willing to receive the additional amount. In the case of *The Czarina*, 2 Spr. 48, $5,500 were allowed for bringing a ship from the middle of the Atlantic into Boston, and furnishing her a navigator. In the case of *The Martin Luther*, Swab. 287, £1,500 ($7,500) were allowed for rescuing a vessel from distress under circumstances of considerable risk, by a service of 24 hours. In the case of *The Andalusia*, 2 Mar. Law Cas. 215, £510 ($2,550) were allowed for towing a disabled steamer for eight hours under circumstances of danger. In the case of *The J. L. Bowen*, 5 Ben. 296, $3,000 were awarded for navigating a ship short of hands into port, in fair weather. In the case of *The Meg Merrilies*, 3 Hagg. Adm. 346, £750 ($3,750) were allowed for towing a dismasted vessel 105 miles for 17 hours. In the case of *The Traveller*, 3 Hagg. Adm. 370, £1,000 ($5,000) were allowed for a meritorious case of towing a helpless vessel. In the case of *The Akbar*, 5 Fed. Rep. 456, $3,600 were allowed for navigating a brig with valuable cargo from Havana to New York. In the case of *The Cleopatra*, 3 Prob. Div. 145, £2,000 ($10,000) were allowed for towing a derelict ship 90 miles into port, amid much danger. In the case of *The Skibladner*, Id. 24, £900 ($4,500) were allowed for furnishing one navigator, who navigated a fever-stricken brig, with most of her crew prostrate, 3,000 miles, from the Gulf of Mexico to England. In the case of *The D. W. Vaughan*, 9 Ben. 27, $1,140 were allowed for towing a disabled schooner from a few miles off Long Island shore to New York. In the case of *The Minnie Miller*, 6 Ben. 117, the steam-ship Pacific was allowed $2,250 for towing a disabled brig, found sailing with a jury-mast, 175 miles, into New York, in a salvage service. In the case of *The Wexford*, 6 Ben. 119, a pilot-boat was allowed $1,500 for towing a dismasted and distressed brig for nine days into port. The award would have been larger, but the amount saved was only $3,800. In the case of *The Albert*, 33 Law J. Adm. 191, £400 ($2,000) were awarded by Dr. LUSHINGTON, on appeal, for standing by and towing for nine days a schooner that had been damaged in a storm off the Dutch coast. Respondents denied that it was a salvage service, and the value saved was only £1,680.

Most of these cases, it will have been observed, were cases in which the services of mere individuals, as seamen or navigators, were thus liberally rewarded, but seldom with reference to the values saved, except where the amount was so inconsiderable as to make a stinted allowance necessary. Among those cited there are but few cases of ocean steamers, running upon fixed schedules, turning from their course, under the behests of humanity, for the generous purpose of conducting distressed vessels into port. This latter was the service rendered by the Bellver, under the appeal of humanity, and at the imperative dictate of duty. Her conduct deserves the most emphatic commendation of the court; and, sitting here in an admiralty court, at this central port between the great marts of American commerce on one hand, and the tropical portions of the continent on the other, which are no less fruitful in pestilence than in all the elements of wealth, I dare not, I have not the

courage to, decree, in view of its influence in future cases, a reward of less than $2,750, over and above costs and expenses, to a costly steamer, laden with a valuable cargo, and having full 50 persons on board, for picking up and bringing safely into port an infected vessel, found far out at sea, with a crew cut down by fever to three worn-out, emaciated men, demoralized by misfortune and fright, and drifting they knew not where, at the mercy of the elements. I am sorry that a just award bears so large a proportion, as the one due in this case, does to the value saved, which is only $7,700. It is to be considered that this is the cash auction value at Norfolk, and much below the mercantile value both of the ship and cargo. The ship is foreign-built, and cannot obtain an American registry, and so her valuation here at only $4,000 is only half her insurable value in France. It is true that in salvage cases we are bound to decree upon values in the port of the forum; but, if a large proportion be awarded, the hardship in this case is only apparent. I repeat, therefore, that I am restrained in the present case, in fixing the amount to be allowed for this meritorious service, by the inconsiderable value of the property saved. The expenses of the Bellver incurred by deviating some three days from her course, and as incidental to the service, were about $1,000. I think the reward due for performing this service ought to be at least $2,750, besides expenses. And therefore I will award the round sum of $3,750, and the costs of this suit. As the counsel for the libelants represent all the persons claiming to participate in this award, I will leave to them the apportionment of the amount awarded among the several claimants as they may think just, subject to revisal and correction by the court after conference with them.