## THE TAYLOR DICKSON.[1]

### BAKER SALVAGE CO. *v.* THE TAYLOR DICKSON.

(*District Court, E. D. Virginia.* February 8, 1888.)

1. SALVAGE—COMPENSATION.

A schooner, worth with her cargo $36,800, lost her main and mizzen masts at sea, and, after running down the coast, anchored off Chicamicomico beach, near Wimble shoals, on the North Carolina coast, and hoisted a signal of distress, which remained up for several hours. The Baker Salvage Company, a professional wrecking company, with headquarters at Norfolk, Virginia, on hearing of the location and condition of the vessel by telegraph, sent a tug valued at $30,000, which, after great risk, and in bad weather and heavy seas, took her in tow and brought her to Norfolk; the expedition taking about two days. The time was in December. *Held,* that $3,600 was a proper salvage award.

[1] Reported by Robert M. Hughes, Esq., of the Norfolk bar.

**2. SAME—COMPENSATION—SOUTH ATLANTIC COAST.**
    Salvage services on the South Atlantic coast demand specially liberal salvage awards, on account of its peculiar difficulties and dangers, and the special necessity for skilled wreckers arising from such difficulties and dangers.

In Admiralty. Libel for salvage by the Baker Salvage Company against the schooner Taylor Dickson.
    *Sharp & Hughes*, for libelant.
    *Walke & Old*, for respondent.

HUGHES, J. The Taylor Dickson is a three-masted schooner of 570 tons measurement. She set sail from Philadelphia on the nineteenth December, last, bound for Savannah, having on board 800 tons of railroad iron; 500 tons of which were in the lower hold, and 300 tons between decks; all well stowed, except, probably, that as much as 500 tons in the hold tended to produce too great a strain when at sea in rough weather on her masts and rigging. She drew about 16 feet of water aft. She was commanded by J. C. Selover, master. By the night of the twenty-fourth December she was passing 30 or 40 miles off shore of North Carolina, abreast of Body island light, under a stiff breeze, and on a heavy sea, when, about 2 o'clock in the morning, her main and mizzen masts broke short off near the deck, and fell, carrying down all their rigging, and destroying the large yawl-boat of the vessel. Masts, rigging, and boat, were so wrecked that all had to be thrown overboard. The foremast and its rigging were left intact. The band of iron that had encircled the mainmast, to which much of its rigging had been attached, was found broken, among the *debris* on deck; and inspection of it showed that it had contained a flaw; both the masts were found to have been rotten; but it is not known whether the breaking of this band produced the fall and destruction of the masts, or whether the breaking of the masts caused the fracture of this iron band. It is probable that the stress of weather and of the heavy sea, aggravated by the extraordinary leverage exerted by the 500 tons of iron in the lower hold, put too great a strain upon the unseaworthy masts and iron band, and caused the disaster which happened. The accident put an end, of course, to the further progress of the schooner on her intended voyage. Capt. Selover at once concluded that it was necessary to put back, as soon as practicable, to Philadelphia, for repairs. As soon, therefore, as the deck was cleared of the broken masts, boat, and rigging, Capt. Selover, with what sail he had, headed towards Body island; for the purpose, as he says, of getting a lee, and of putting himself in reach of the life-boats from the life-saving stations on that coast. After thus heading towards land, and reaching within 7 or 8 miles of the beach, he proceeded some 20 miles further down along the coast, until he had crossed Wimbe or Wemple shoals. He anchored about 1 o'clock on the 25th at a point within the shoals, about 3 miles from the beach, and opposite a point about half way between the life-saving station at Chicamicomico and the station six miles south of it. Soon after casting anchor, he hoisted a flag of distress, and kept it flying the rest of the

day. There is some conflict in the evidence as to the place of this anchorage. Capt. Selover insists that it was in eight fathoms water; but witnesses of the libelant say it was in not more than five. The life station's men, and all other witnesses, say that the schooner lay within the breakers produced by Wemple shoals; while the witnesses of respondent insist she was outside. I conclude that she was inside. If Capt. Selover's object was, as he says, to get into a lee from the north and north-east wind, he could have attained that object only by getting to leeward of the shoals, or within them. If, moreover, his object was, as he says, to get within reach of the boats of the life-saving stations, he could have done so only by putting himself within the line of breakers produced by the shoals.

About a fortnight before the accident which befell the Taylor Dickson, the ocean steam-ship Kimberley had been driven ashore off False cape, on the same coast; and the work of taking off her cargo and saving the ship was going on, whenever weather and sea permitted, at the time the Taylor Dickson suffered her misfortune. A stiff wind from the north-east, and a heavy sea, prevailed during the night of the twenty-fourth December, and all day and into the night of the 25th. The sea was too heavy during the 25th and on the 26th for life-boats to go out from Chicamicomico station to the Taylor Dickson. It was too heavy for the salving operations on the Kimberley to be carried on. The weather was too thick, and the sea too rough, on the 25th for communication to be made from the Kimberley, or from the shore, with the steamer Victoria J. Peed, which lay a mile and a half off shore abreast of the Kimberley, engaged in saving her cargo. Word having come to the Baker Salvage Company, in Norfolk, late on the 25th, that a schooner with main and mizzen masts gone, was lying off Chicamicomico, under a flag of distress, that company at once dispatched the tug Sampson to the distressed vessel. The Sampson is a steamer of extraordinary power, valued at $30,000, of 155 tons measurement and 430 horse-power. The Baker Salvage Company is organized, chartered, and conducted as a wrecking company; possesses the steamers, schooners, material, and appliances usual and necessary for that business; and has wrecking property costing $80,000, which, from the nature of its risks, cannot be insured. This company had under charter the Sampson to aid in saving the Kimberley and her cargo, at the rate of $100 a day, whether engaged in the salving operations or lying in bad weather at the wharf. The Sampson left Norfolk in the afternoon of the 25th, and lay off the coast beyond Cape Henry during that night. It set off early the next morning, and reached the Taylor Dickson about noon. Its officers describe the sea as very rough at the time; so much so, that the act of getting to the Dickson and getting a cable to her was difficult, and involved extraordinary risk to the tug and her crew. After an effort of more than an hour, the tug's cable was made fast to the schooner. The captain of the tug being unwilling to risk his vessel in that place any longer than was absolutely necessary, directed the schooner to slip her cable, which she did without objection, and with the consent of Capt. Selover. The Sampson left Wemple shoals, with the Taylor Dick-

son in tow, about 2 o'clock on the 26th, and brought her safely into the harbor of Norfolk in the forenoon of the 27th. The value of the Dickson and her cargo is appraised in round numbers at $36,800.

In the foregoing recital, I have made no allusion to a good deal of evidence in the case. There is much conflict between the testimony of witnesses in behalf of the schooner and all the witnesses, including the life-saving officers, who were examined on behalf of the libelant. The drift of the testimony for the respondent was to show that the schooner was lying safe and sound on or near Wemple shoals; and that the service rendered her was not a salvage service because of the fact, as they alleged, that the schooner was in no danger. I feel bound to reject this pretension as not only untrue, but uncandid. Why the flags of distress all the afternoon of the 25th? Why was the flag on the 26th hung in such a manner that the steamer which passed in the offing stopped to send a boat to her to inquire her condition, and to offer assistance? Why the effort which was made by the other schooner that came near her on the night of the 25th, and again in the morning of the 26th, to render whatever assistance the wind and waves permitted? If the sea was not rough, why did the life-boat from Chicamicomico station not come off to her on the 25th, nor on the 26th? It seems that every eye that saw her during the 24 hours that she lay at Wemple shoals regarded her as in extreme distress; and so I conclude that she was. She had come out from the port of Philadelphia in a sadly unseaworthy condition. The vessel was old. Her best cable was seven years old. Two of her masts were rotten; and granting, for argument's sake, that the sea and wind were as mild on the night of the 24th as Capt. Selover pretends, those masts and the iron band which encompassed one of them, were not equal to the strain of such weather and sea. Here, then, was a schooner with only the foremast intact, laboring on a sea, which, in the same season of the year, in 1876, had engulfed the Huron; in 1887 had wrecked the German ship Elizabeth, and all on board; in 1880 had stranded the powerful steamer Sandringham; and in 1883 had beached the still stronger Egypt. By accident or by design, (I think by accident,) this unseaworthy and disabled schooner found herself, in the course of 12 hours, between the breakers of Wemple shoals and those of Chicamicomico beach. The sea was too rough for her to be reached from land. She was in a condition and position that attracted the sympathy and enlisted the endeavors of all who saw her. A tug from Norfolk went around on that dangerous coast, in that hazardous season of the year, over a distance of 115 miles, and brought her into port. It was a salvage service. It was a service in which a vessel in danger of the sea and in disabled condition was rescued. It was a service in which a valuable steamer, not built for the outside waters, and running extraordinary risk in going out upon them in midwinter, but which was the only one available, went to the schooner's succor, risking property worth nearly as much as the property saved, and risking the lives of her crew. It was a service of higher than ordinary grade. I repeat now what I said in the case of *The Mary E. Dana*, 5 Hughes, (U. S.) 362, 17 Fed. Rep. 353.

"Salvage services, on the long and dangerous coast which stretches from the Delaware capes to Florida, ought to be more liberally rewarded than on other coasts. It is not a seaboard studded with harbors and prosperous commercial cities and towns from which salvors may run out short distances along shore, and render successful services in a few hours. It is a long coast, dangerous and barren, constantly swept by strong winds and currents; where the ordinary tide varies only three feet; and on which wrecking enterprises cannot be successfully accomplished by individual exertions and capital. Wrecking service here can only be successfully performed by organized capital, enterprise, and skill; by capital, skill, and enterprise, so organized as to be capable of maintaining a constant provision of experienced mariners, powerful wrecking vessels, and ample wrecking implements and material, ready at all hours for immediate service. The business cannot sustain itself in the hands of reputable men and companies, unless the admiralty courts shall give exceptionally liberal rewards in all cases of meritorious and successful service on this seaboard. And surely it is in the interest of commerce to sustain the wrecking business in these waters and latitudes. For these reasons I repeat, salvors on this coast must be more liberally dealt with by the admiralty courts than on other coasts."

Our courts are bound, in mercy to life and property, to pursue a liberal policy with those who engage in the salvage of property and life on such a coast.

I have felt since I passed upon the case of *The Fannie Brown*, 30 Fed. Rep. 215, that my award there was illiberal and meager; but it was made without reference to the storm which that vessel escaped by but a day, and which destroyed the great ship Elizabeth. If that event could have been allowed any consideration, the award would have been nearer $5,000 than $1,500. Although the Fannie Brown had lost parts of two masts, she still had 55 feet of one of them and 41 of another. She had lost no sales, and was a new, staunch vessel. Her crew, with rare pluck, had improvised a rigging much more capable of keeping her out of harm's way than the meager rigging left to the Taylor Dickson. The value saved was only half that saved in the present case. But the chief difference between the two cases consists in the important fact that the Fannie Brown was found and brought in by the Victoria Peed, a wrecking steamer built for outside work, and which encountered little risk comparatively in going out upon that coast; while the Taylor Dickson was rescued by a tug built for inland waters, and which cannot live in the storms and seas that so often prevail on the coast from False cape to Hatteras. She took the risk of that adventure, in response to the Taylor Dickson's appeal of distress, and earned a higher reward than would have been due to a steamer adapted to those waters.

I think the *quantum meruit* value of the Sampson for the better part of three days' service, at $200 a day, should be assessed at $600, and that the bounty should be $3,000, and I will sign a decree for $3,600.