THE GREAT NORTHERN.

BELGIAN AMERICAN MARITIME CO. v. THE GREAT NORTHERN.

(District Court, E. D. Virginia. March 2, 1896.)

1. SALVAGE—TOWAGE ON HIGH SEAS.
    Towing a disabled vessel on the high seas, owing to the latent danger from the multiform accidents to which ships are constantly liable, is always a salvage service.

2. SAME—VALUE OF SALVAGE SERVICES.
    The value of a salvage service consisting in a towage upon the high seas is to be estimated by the circumstances of the two vessels, and by the conditions of wind and sea prevailing at the time the service is entered upon, and by the casualties which experience teaches practical seamen are liable to happen in the ordinary course of events while the service continues; and the fact that the weather and sea afterwards prove favorable is not a reason for diminishing the award.

3. SAME—AMOUNT OF COMPENSATION.
    $10,000 awarded to a whaleback steamship of about 2,300 gross tonnage, worth $100,000, bound from Tampico, Mex., to New York, with a cargo worth about $137,000, for towing to Newport News a steamship of over 3,000 gross tonnage, in ballast, worth $100,000, which was found with a broken propeller shaft about 14 miles northeast of Cape Hatteras; the service being commenced in a rough sea, and the hawsers of the towed vessel being got aboard of the whaleback with great difficulty and danger; the service lasting nearly 24 hours, and delaying the towing vessel two days on her regular trip.

This is a libel by the owners and crew of the steamship Sagamore against the steamship Great Northern for an award of salvage.

The Sagamore is a steamship of the whaleback type, of about 2,300 tons gross, and 1,801 tons net, with triple expansion, vertical engines of 1,400 horse power indicated, and nominal horse power 350, English register. Her home port is Antwerp, in the kingdom of Belgium, and her owner is the Belgian American Maritime Company. She is built of steel. Her length is about 315 feet, beam about 38 feet, and depth about 25 feet. Her highest carrying capacity is about 3,600 tons; her registered tonnage, English measurement, is 1,379 tons; and she was two years old September 23, 1895. Her speed was about 10 or 11 knots per hour, loaded as she was. On May 25, 1895, while bound from the port of Tampico, Mexico, to New York, with a valuable cargo, she sighted the Great Northern off Cape Hatteras, bound from Philadelphia

THE GREAT NORTHERN. 679

to Port Royal, S. C., in ballast. The Great Northern is a steel screw steamship, built in December, 1892, of about 3,022 gross, and 1,951 net tonnage, with engines of about 276 horse power. Her length is 322 feet, her beam 41 feet 6 inches, and depth 24 feet. She had two tri-sails, two stay-sails, and a jib. The height of her main tri-sail, which was her largest, was 38 feet. She had only fore and aft sails, and no yards. The Great Northern was in ballast. The Sagamore was loaded with bullion, lead, hides, skins, fonstic (a sort of dye wood or log wood), and Mexican fitre; and her cargo was worth $246,-459.39 in Mexican dollars, or $136,921.88 United States currency; her freight, $1.211; and the vessel, by agreement, was worth £20,000, or $100,000. The value of the Great Northern is fixed at £20,000, by agreement for the purposes of this suit, or $100,000. She was, however, worth more than this amount. At or about the time the Sagamore first sighted the Great Northern, the latter broke her shaft in pieces between the after bulkhead and the stern, and had become disabled. She had dropped one anchor, and was blowing off steam heavily, and had hoisted her signal for assistance when the Sagamore sighted her. The Great Northern was first sighted at about 4 p. m. (Sagamore's time) of the 25th May, and at about 4:15 p. m. was flying signals about 2 points on the starboard bow of the Sagamore, at a distance from the Sagamore of 2½ miles. At about 4:30 p. m., the Sagamore spoke the Great Northern, and began to make arrangements to take her in tow. She had passed Cape Hatteras abeam at 4 p. m., about 10 miles off. After arriving at the Great Northern, and learning that she wished to be towed to the Chesapeake, and declined to be towed to New York, the master of the Sagamore, with her officers and crew, began to make arrangements to take the Great Northern in tow, about 4:30 p. m. (Sagamore's time). There was prevailing at the time a heavy swell from the northeast and east to the southwest. The sea was confused and dangerous. On the 24th there had been a strong gale off this coast, but the wind had moderated on the morning of the 25th, leaving, however, a heavy swell. The weather was pretty rough, and the sea was running pretty high. The wind was northeast to east; say, moderate from the northeast. Although the Sagamore commenced making preparations to take the Great Northern in tow about 4:30 p. m., the conditions of sea and wind were such that she did not get the lines fastened and commence towing until 7:30 p. m.; these preparations taking three hours. There are many reasons shown for this long delay, only some of which will be here set out. The weather was rough, and the sea heavy. It was difficult, in the sea and weather prevailing, to get a vessel of the conformation of the Sagamore in position, or keep her there. Both vessels rolled heavily, and every precaution had to be exercised to prevent collision, which would have endangered the safety of both vessels. The Sagamore is a whaleback, with round deck. She is built to allow the waves to wash over her, and they did wash over her on this occasion. She is not a towing vessel, was not built for that purpose, and was not provided with hawsers for towing. In order to take the Great Northern in tow, all her aft sails and stanchions as far forward as her turret had to be unshipped, and this took time, and exposed her crew to extra danger in working on her deck, because, in the rolling of the ship and against the washing of the seas, they had nothing to catch hold of except the capstan and towing rail. Both her derricks had to be unshipped, and one lashed to the side; and the other across the whaleback, to keep the two hawsers clear of the propeller. This involved time, trouble, skill, and danger. At times the crew working on the deck were in danger, and had to run to the turret for security. The hawsers used in the towing service were those of the Great Northern. There was risk and trouble in hauling the two hawsers aboard the Sagamore, in consequence of their being twisted, and requiring time, labor, and skill in getting them untwisted for use. It took about three-quarters of an hour for this work on the hawsers to be accomplished, all hands, firemen and sailors, being engaged in the work. In endeavoring to get the hawsers to the Sagamore, the port lifeboat of the Great Northern was smashed, and there was great difficulty, after the starboard lifeboat was launched, in getting the hawser lines aboard. When the Sagamore reached her, the Great Northern was anchored, with one anchor laid, at a point about 14 miles from, and to the north and east of, Hatteras. Her tail end shaft was broken in the stern tube. The tube also was broken, and the propeller was firmly fixed against the rudder post. She

was not in a condition to navigate after the breaking of her shaft, had come to anchor, and was flying her signal of distress. The place where she was anchored off Hatteras was on the most dangerous part of the Atlantic coast. She was rolling heavily, and was in ballast, and was therefore the more exposed. She lay high above the water, with 15 feet of free board. She could not be navigated in her condition, with the sails she had. These were not sufficient to give her steerage way. The service consumed nearly 24 hours, and delayed the Sagamore 2 days on her regular trips. The distance towed was 125 miles. It took her 125 to 150 miles out of her way, her destination being New York. It was a service along the Atlantic coast, dangerous at all times to such a tow. The hawsers used were about 70 fathoms in length. During the towing, the Great Northern yawed considerably, and there was always danger of the towing lines fouling the propeller of the Sagamore, which was prevented by lashing one of the derricks across the tow rail. During the towing, a fog was encountered, so dense that the Great Northern could not at times be seen from the Sagamore. The engines of the Sagamore were put to a great strain, and, while no injury of great moment actually happened to them, it required the utmost caution and care to prevent it. All this was prevented by the skill and attention of the officers and crew on board the Sagamore. There was nothing omitted that ought to have been done by them to prevent disaster to both vessels during the towing. Extracts are inserted from the logs of the two ships:

From the engineer's log of the Great Northern:

"May 25th, 1895. At 4 p. m. Strong wind and high sea, running on port bow; engines racing badly, and ship diving and rolling. Eased steam back 10 lbs. Wind and sea increasing, and engines racing very badly; short stop valve down, and stood by throttle valve constantly. At 4:30 p. m. wind moderated slightly, but very high sea still running. At 4:55 p. m. the engines raced away at terrific speed, giving evidence at once of some part shafting having broken. The steam was shut off as quickly as possible; the gear run over; and the engines thereby stopped. This was not done before engines had received a terrible shaking. We very soon ascertained that tail end shaft was broken, the shaft protruded right out of stern tube, and bore up against rudder. The propeller was badly damaged, all blades being broken by coming in contact with curved parts of aperture. On examination in funnel, I found stern gland broken, bulkhead plates buckled around flange of stern tube, and flange of tube sprung right away from bulkhead. The two after-lengths of shafting were found to be lifted hard up against bearing keeps, also after-bearing badly sprung away from seating, and bolts of same very much strained. The tail shaft was broken midway between the two brass liners. I also found that the part of the tube between fractures turned round ½ a turn, and one had worked underneath another end of tube, and thereby jamming the shaft and tube very tightly together. There was also a piece of the shaft broken clean off about 8 in. long, 5 in. broad, and 4 in. deep, lying in the bottom of tube. This piece showed plainly by the way it was marked that it had been jammed between shaft and tube, and most likely was the sole cause of the damage to tube."

Extract from Sagamore's log:

"May 24th. 4 a. m., strong breeze and high sea; ship rolling heavily, and shipping water fore and aft. 8 a. m., strong breeze, with very rough confused sea; ship rolling, and shipping heavy water fore and aft. Noon, similar weather throughout. 4 p. m., strong breeze and rough sea; shipping much water. 8 p. m., strong gale and squally, with high sea; ship rolling heavily, and shipping large quantities of water fore and aft. Midnight, no alteration in the weather.

"May 25th. 4 a. m., strong gale and heavy sea, with hard squalls and rain; ship laboring heavily, and shipping much water fore and aft. 8 a. m., weather moderating; sea still very confused. 10 a. m., less wind and sea. Noon, fresh breeze and cloudy, with rain at intervals; ship rolling considerably in a confused cross sea. 3:45 p. m., sighted Hatteras light house. 4 p. m., abeam; distant ten miles; variable winds and hazy, with confused sea; ship rolling heavily. 4:15 p. m., signaled by S. S. Great Northern, for assistance, her shaft being broken. 4:30 p. m., bore alongside, and prepared to tow her to Chesapeake. 7:30 p. m., having passed hawsers and cleared away gear on after

whaleback, proceeded to tow; Hatteras light bearing S. W. by W. ¾ W.; distant 14 miles; sea very rough and confused; both ships rolling heavily; much lightning to the eastward. 11:45 p. m., a small schooner fouled our tow. * * *

"May 26th. 12:10 a. m., Bodies Island abeam; distant 8 miles. 4 a. m., light variable winds and overcast. 4:50 a. m., set in foggy. 5 a. m., reduced speed; thick fog. 7:30, soundings, 13 fathoms. 8 a. m., calm, with thick fog. 9:45 a. m., fog clearing; full speed. Noon, thick fog; reduced speed; soundings, 9 fathoms. 1:20 p. m., arrived off Cape Henry, and signaled. 1:30 p. m., fog clearing; took pilot on board, and proceeded for Hampton Roads. 5 p. m., reduced speed, and prepared to cast off tow. 5:20 p. m., cast off tow, and proceeded easy towards the quarantine station. 5:50 p. m., anchored; soundings, 12 fathoms; light breeze and cloudy."

The service rendered by the Sagamore was opportune, was performed at risk to life and property on the part of the Sagamore and her crew, and was performed promptly. It was entirely satisfactory and successful; so much so that, after the arrival of the two steamers at Newport News, the master of the Great Northern and his officers showed their appreciation by formally thanking the master of the Sagamore for his services.

Brown & Brune and Walke & Old, for libelant.
Convers & Kirlin, for respondent.

HUGHES, District Judge (after stating the facts as above). The sole question in this case is the amount to be allowed to the Sagamore for salvage and for towing. Towing a disabled vessel on the high seas is always a salvage service. Courts, judges, and lawyers of the interior are apt to assimilate this service to towing on the inland canals and rivers of the country, and are apt not to realize the full nature of towing at sea. In the towing of a canal boat by a mule on a towpath, there is no danger of the boat running into the stern or sides of the mule, or of the mule's backing down from the towpath and driving its heels into the stem of the canal boat (which has no stem). On the rivers of the interior West, a steam tug goes right up to the boat to be towed, is made fast close alongside, not even fenders being always interposed between the two vessels, and moves out with its tow into the channel, to breast a steady flow of water if ascending the stream, or to ride upon it if going down stream; the unbridled wind, that dread vis major of the ocean, not entering at all as a factor in the adventure. The case is different on the ocean, and especially off the North Atlantic seaboard, where the sea is never at rest, and where a cessation of winds is almost unknown. In those waters vessels are never in comparative safety except when under headway, and are always in more or less danger when merely riding the waves. In the act of making preparations for towing and being towed, ships out at sea are very liable to collisions, to the fouling of hawsers, to the smashing of small boats, to losing anchors, and to other serious accidents. After getting under way, and commencing the towing service, there is constant danger on the open sea, when the disabled ship has no power of self-control. The hawsers are made as long as practicable, often 70 fathoms or more, in order to keep the vessels far apart. During the towing, the varying conditions of wind and wave are fruitful of casualties. In the case of The Strathgarry, which will be mentioned in the sequel, there is a **striking instance of the unforeseen accidents incident to towage on**

the open main. In that case there was a contract for only a half hour of ocean towage, which was undertaken and performed for a stipulated price. But, "just at the expiration of the half-hour, the hawser broke, and the manilla spring attached to it, recoiling, killed the chief officer of the vessel under tow, seriously injured two other persons, and damaged the skylights and steering gear of the towing ship to the amount of five hundred dollars." It is the latent danger from the multiform accidents to which ships are constantly liable that make a towage service on the open seas, rendered to a disabled ship, always a salvage service.

When the Sagamore approached the Great Northern for the purpose of taking her in tow, the sea and wind were such as to require the utmost care and caution. The Great Northern, having no cargo on, and but one anchor down, lying upon a rolling sea, against a fresh wind, with the exposure of 15 feet of free board, was like a cork upon the water. The evidence makes it probable that she was also dragging her anchor; for the wind was strong, and the bottom smooth and of sand. Under these circumstances, to approach her, and engage in the necessary preparations for taking her in tow, involved in itself the most serious danger. The Sagamore was not built for towing and salvage service. She was meant for rapid ocean navigation in all weathers. She had, practically, no free board, and neither wind nor wave could seriously affect her navigation. She had little capacity for maneuvering at sea; nothing but rudder and propeller; her engineer in the hold receiving directions, through a tube, from the officer in the pilot house.

The value of salvage service is estimated by the circumstances of the salved and salving ship, by the conditions of wind and sea prevailing at the time it is entered upon, and by the casualties which experience teaches practical seamen are liable to happen, in the ordinary course of events, while the service continues.

In the case of The Strathgarry [1895] Prob. 264, which was a case in which a sum was agreed upon between salvor and salved before the service was undertaken, the high court of admiralty, Bruce, J., said:

"In forming an opinion of the fairness or unfairness of the agreement, I think the court must regard the position of the parties at the time the agreement was entered upon. The agreement cannot become fair or unfair by reason of circumstances which happened afterwards. * * * In services of this character a very considerable part of the danger and difficulty arises at the commencement of the service. Hawsers are not made fast between large vessels in the South Atlantic, even in fine weather, without risk; and the mere maneuvering of the Hawkhurst [the salving ship], and the commencing to get a strain upon the towing hawser, was a service certainly attended with some danger. The Strathgarry [the ship towed] is a steamship of 5,000 tons gross, and the towage of such a vessel was a service necessarily involving risk. * * * Such a service must have put a considerable strain upon the engines of the Hawkhurst, especially having regard to the violent sheering of the Strathgarry. * * * In considering the fairness or unfairness of the agreement, I cannot, I think, as regards the Hawkhurst, any more than as regards the Strathgarry, take into consideration the events that happened after the agreement was made. But the events which actually did happen are only illustrations of the risks incidental to such service as the Hawkhurst rendered."

That there was an agreement upon the amount to be paid for salvage service in the case of The Strathgarry does not affect the principles to be observed in salvage cases, where the contract, as regards the compensation to be paid and received, is implied, and not agreed upon.

As before said, the value of the service is to be estimated by the conditions of wind and sea prevailing at the time it is entered upon, the circumstances of the salved and salving vessels at that time, and the casualties which experience teaches practical seamen are liable to happen in the course of events while the service continues. In the case at bar, the answer admits that this was "a meritorious salvage service." The logs of the two ships, extracts from which are given in the statement of facts prefixed to this opinion, show that the Sagamore encountered very serious risks in going to the relief of the Great Northern, and in preparing to take her in tow. She herself, as well as the Great Northern, was afterwards liable to all the usual risks attending the towage, on the North Atlantic seaboard, of a great steamer, of more than 3,000 tons gross, and with 15 feet of free board exposed to the wind. The Great Northern's motive power was entirely disabled; her propeller useless, and bearing up against her rudder; she was without yards or square sails; and she had only a fore and aft rigging, which was not sufficient to give her steerage way. She was in ballast, and liable to plunge and to sheer ad libitum. She did sheer much during the towing, and brought injurious straining upon the engines of the Sagamore. The latter ship was in constant danger of her propeller fouling with the towing hawser. This vessel had $237,000 of values at risk, and brought the Great Northern, worth $100,000, safely into port. Fortunately for both ships, the weather and sea proved favorable after the towage was commenced. This last fact seems to be relied upon by the respondents as a reason for diminishing the amount which might otherwise be awarded to the salvors. Sufficient has been said to show that this principle does not hold good in admiralty. The good fortune of better weather and a quieter sea, which occurred during the course of the towing service, inured alike to both ships, and does not entitle the salved ship to claim the benefit of it, to the injury of the salving vessel. I think the award in this case should be liberal; and I will sign a decree for $10,000 and all the costs of this suit.

As to the considerations which usually enter into salvage service, see The Mary E. Dana, 5 Hughes, 362, 17 Fed. 353; The Marie Anne, 5 Hughes, 462, 48 Fed. 742; The Sandringham, 5 Hughes, 316, 10 Fed. 556. See, also, The Taylor Dickson, 33 Fed. 886; The Akaba, 4 C. C. A. 281, 54 Fed. 197; The Phœnix, 10 C. C. A. 506, 62 Fed. 487; and The Florence, 65 Fed. 248, for the opinion of this court.

Decree (March 31, 1896).

This cause came on this day to be heard upon the pleadings and proofs, and was argued by counsel; on consideration whereof the court, for reasons stated in writing and filed herewith, doth order and decree:

1. That the libelants, the Belgian American Maritime Company of Antwerp,

Belgium, owners, and Theodore Voss, master, of the steamship Sagamore, on behalf of themselves and the crew of the said steamship, do recover of the steamship Great Northern, for the services mentioned in the libel, the sum of $10,000, with interest thereon from the 1st day of November, 1895, till paid, and all costs expended by them to be taxed by the clerk of this court.

2. And it appearing to the court from the record that the steamship Great Northern was discharged from arrest in this cause by giving bond with C. J. Smith, J. G. Womble, and C. W. Grandy, as stipulators, the court doth further order and decree that the said Belgian American Maritime Company, of Antwerp, Belgium, and Theodore Voss, on behalf of themselves and crew of the said steamship Sagamore, do recover of the said C. J. Smith, J. G. Womble, and C. W. Grandy the said sum of $10,000, with interest from the 1st day of November, 1895, till paid, and costs; to be taxed as hereinbefore provided, and may have their writ of execution to enforce the payment of the same against the said stipulators or either of them.

3. And the court proceeding to apportion the sum hereinbefore decreed, doth further order and decree that out of the amount awarded the sum of $3,000 shall be allowed the master and crew of the said steamship Sagamore, of which the sum of $750 shall be paid to Theodore Voss, the master of the said steamship, and $2,250, the balance thereof, shall be paid to the remaining officers and crew of the said steamship in proportion to the wages received by the said officers and crew, respectively, at the time of the services mentioned in the said libel, and that the amounts awarded to the said master and crew shall be net amounts, free of counsel fees, and that the balance of the said award shall be paid to the said Belgian American Maritime Company of Antwerp, Belgium, the owner of the steamship Sagamore, or their proctors of record.

But no execution shall issue on this decree until after the expiration of 20 days from this date.

Norfolk, 31st March, 1896.