# THE LEIPSIC.*

(*Circuit Court, S. D. New York.* February 7, 1882.)

1. SALVAGE SERVICE.

The steam-ship L., bound from Baltimore to Bremerhaven, broke her shaft when about 320 miles from Sandy Hook. After endeavoring for seven days to reach the nearest port of the United States under sail, during which time she refused offers of assistance, her captain, when within 125 miles of Sandy Hook, signalled for assistance and requested a passing bark to send aid. The bark, after proceeding some 40 miles, spoke the steam-ship G., bound from Newport, England, to Baltimore. The G. went to the assistance of the L. and towed her to New York. *Held,* to be a salvage and not a mere towage service, and that the crew of the G. were entitled to share in the award.

2. SAME—COMPENSATION—AGREEMENT BETWEEN CAPTAINS.

The captains of the two steamers, before the L. was taken in tow, entered into an agreement whereby the G. was to tow the L. to Sandy Hook for the sum of £3,000, "but leave it to the court to prove the said agreement." *Held,* that the agreement was made subject to the approval of the court as to the amount, and that the court should award a proper compensation, on a *quantum meruit,* notwithstanding the agreement.

In Admiralty. On appeal from the district court.

*Lorenzo Ullo,* for libellants.

*William D. Shipmam,* for claimant.

BLATCHFORD, C. J. In this case I find the following facts:

The screw steam-ship Leipsic, of about 2,000 tons burden, one of the regular line of steamers of the North German Lloyd, plying between Bremerhaven and Baltimore, left the latter port, bound for the former, at 2 P. M. on the fourth of September, 1879, with a general cargo and 12 steerage passengers. She passed Cape Henry on the 5th, at 4:45 A. M., and proceeded to sea. On the 6th, while the weather was fine, the wind northerly, and the ship running at about 10 knots, that portion of her propeller shaft known as her "first transmission shaft" broke. This accident deprived her of the power of propulsion by steam. She was then in the gulf stream, in latitude 37 deg. 58 min. N., and longitude 68 deg. 43 min. W., and about 320 miles from Sandy Hook. Her sails were all set, and she was immediately hove to in order to disconnect her screw-shaft from the remainder of the shafting between the screw-shaft and the point of the fracture, so that the screw-shaft could revolve freely when the ship was in motion. This was done by dropping down that portion of the shaft between the fracture and the screw-shaft. Then, when the vessel was in motion, the screw-shaft revolved freely in its bearings. The ship was then put under sail on a W. N. W. course, intending to reach the nearest port on the Atlantic coast of the United States. She was in all respects, except as to the injury to her machinery, staunch and strong, well

*Reported by S. Nelson White, Esq., of the New York bar.

manned, equipped, and provisioned. She continued under sail till the 13th, when the libellant's ship took her in tow.

The Leipsic made about 25 miles from 2 P. M. on the 6th to noon on the 7th. The next 24 hours she made about 10 miles; the next 24 hours, 41 miles; the next 24 hours, 38 miles; the next 24 hours, 52 miles; the next 24 hours, 50 miles, bringing her down to noon of the 12th. From that time to noon on the 13th it was nearly calm, and the current carried her 20 miles north-easterly. On the 9th, at 1:30 P. M., she was passed by an English steamer, which made an offer of assistance, which was declined by the captain of the Leipsic on the ground that he did not need assistance. During the days the Leipsic was under sail she sighted several steamers, but she made no signals for assistance. On the 12th, her captain, the wind having died away, had decided that it was necessary for him to reach a port quicker than he could do so under sail; that his only means of so doing was to be towed in by a steamer; and that the saving of time thereby was an advantage to the ship and her owners from a business point of view. For that purpose, when he went below on the night of the 12th he ordered rocket signals to be thrown up whenever a steamer should pass. One did pass at a distance of five or six miles, but failed to heave to or answer the signals. About noon of the 12th the Leipsic had spoken a bark bound for the Delaware breakwater, and asked her to report the steamer as being there with a broken shaft.

About 8 or 9 o'clock on the morning of the 13th the steamer Gresham, bound from Newport, England, to Baltimore, Maryland, in ballast, overtook the bark, which had been previously spoken by the Leipsic, and was informed by the bark that there was a steamer to the eastward with a broken shaft, giving her supposed latitude and longitude. The Gresham was immediately put about, and proceeded in the direction indicated, which was nearly opposite to her former course. At about noon on the 13th the Gresham, having proceeded 40 miles from the point where she was spoken by the bark, appeared in sight, and the Leipsic signalled her that she had a broken shaft. The Gresham came up to her, and, when within hailing distance, her captain asked the Leipsic if she wanted a tow, and the reply was that she did. The captain of the Gresham then went on board of the Leipsic, and the latter showed the former the position of the ship on the chart—39 deg. 28 min. north latitude, and 71 deg. 25 min. west longitude. The reckoning of both ships agreed. Measurements were made on the chart, and Sandy Hook was found to be distant 125 miles and to be the nearest port. The captain of the Gresham was then asked what he would tow the Leipsic to Sandy Hook for. The two captains differ as to the price that was named,—one testifying that it was £6,000, and the other that it was £4,000. The captain of the Leipsic told the captain of the Gresham that if he did not come down any further the ship was in very good sailing order, he had all his square sails set, and that he could help himself in any weather with his ship under sail. During the negotiations another steamer hove in sight, about five miles off, and within signalling distance; but she was not signalled, and night was coming on, and the captain of the Gresham insisted that he was first on the ground. The captain of the Leipsic said to the captain of the Gresham that there was a

steamer near by which could give him equal assistance. Finally an arrangement was concluded, as set forth in the following paper, signed by both captains on board of the Leipsic:

"Latitude 39 deg. 30 min. N., longitude 71·deg. 25 min. W., September 13, 1879. It is this day agreed between Capt. F. Pfeiffer, of the S. S. Leipzig, and Capt. Gibl, of the S. S. Gresham, to tow the said steamer Leipzig, to Sandy Hook for the sum of three thousand pounds, (£3,000,) but leave it to the court to prove the said agreement."

The words, "but leave it to the court to prove the said agreement," were added before the agreement was signed.

The master of the Leipsic refused to make the agreement except upon that condition, because he thought the sum named too high. He is a German, but he spoke English, and the conversation was in English. The master of the Leipsic asked to be towed to New York, saying that he would make his repairs there. The master of the Gresham told him it would be out of his course, but that the Delaware breakwater was in his way; but he would take him there, or to Sandy Hook, as he pleased, and the latter place was agreed upon. The weather was good, and the sea was smooth. The wind was very light. The Gresham took the Leipsic in tow by two hawsers, furnished by the latter. They got under way soon after the agreement was signed, in the afternoon of the 13th, and passed Sandy Hook about 3 o'clock in the afternoon of the 14th, and proceeded about six miles up the bay, where the hawsers of the Leipsic were transferred to a tug, which towed her to Hoboken. The Gresham waited in the lower bay of New York a short time for some trifling repairs to her machinery, (such repairs, however, having no connection with the service rendered to the Leipsic,) and then proceeded to Baltimore. She arrived at the mouth of Chesapeake bay at 9. A M. on the 16th. She had calculated to arrive there on the morning of the 14th. She was a freighting steamer of 1,092 tons net measurement. She was under charter to proceed to Baltimore, and there take on board a cargo of grain for a port of delivery in Great Britain or Ireland, or on the continent, between Bordeaux and Hamburg, both inclusive, but excluding Rouen, according to orders to be given on signing bills of lading. By the charter she was required to be at Baltimore not later than the twenty-fifth of September. The freight earned by her on her outward voyage from Baltimore was about $13,750. The agreed value of the Leipsic is $90,000, and that of her cargo $160,945. The amount of her freight on that voyage was $13,-757.37. The value of the Gresham is $90,000. The Leipsic was expected to make a round trip, at that season, every six weeks. By keeping her turn on her return trip she would presumably carry some 250 steerage passengers in addition to her cargo. The Leipsic at the time had six months' provisions on board. The captain of the Leipsic had commanded three steamers of the North German Lloyd, and up to the time of the trial in the district court remained in its employ. He was an experienced master. The service was rendered without accident. It was not attended with any special difficulty or danger. The weather was at first fair, and soon after they started the wind became fresher, and both vessels set all sail, and then they made for a

time about seven knots. The following night it became rainy and squally, and the wind getting around to the south-west, they proceeded under steam alone. The Gresham sustained no damage to her machinery in consequence of the towage, and suffered no loss of employment by reason of the delay. The Leipsic paid $150 to the tug which towed her from the place where the Gresham left her to her dock in Hoboken. This was on Sunday, and there was no other tug there.

On the foregoing facts my conclusions of law are that the service was a salvage service; that the court ought to award a proper compensation on a *quantum meruit,* notwithstanding the agreement; that the £3,000 is an excessive amount; that the proper amount is $5,500; that of that the owners of the Gresham should have $4,125; that of the remaining $1,375 the master of the Gresham should have $150; that the remaining $1,225 should be divided among the master, officers, and crew of the Gresham in proportion to the rates of their respective wages; that the $1,375 remain in court till applied for; that the libellants have their costs in the district court, taxed at $54; and that neither party recover any costs of this court.

SAM'L BLATCHFORD, Circuit Judge.

BLACTHFORD, C. J. The district court awarded $3,750 to the owners, master, and crew of the Gresham, of which three-fifths was to go to the owners of the Gresham and two-fifths to her master and crew; the master to have one-tenth of the two-fifths, and the officers and crew, including the master, to have the remainder, in proportion to the rates of their respective wages. This gave to the owners $2,250; master, $150; master, officers, and crew, $1,350. The libel was filed by the owners alone, on the agreement, and not as in a cause of salvage, for 'owners, master, and crew. The court ordered the $1,500 to remain in the registry to await an application for it by the master, officers, and crew. The libellants have appealed to this court because the district court set aside the contract and did not allow the £3,000. The claimant has appealed on the ground that too much was allowed.

The district court held that the agreement was made subject to the approval of the court "as to the amount therein named, £3,000, as the amount to be paid for the towage service;" that the amount suggested by the agreement was very greatly in excess of the amount which the court would award for the same service; and that, under the circumstances, the service was a salvage service.

It is contended for the libellants that what the parties agreed to leave to the court was, not to approve the sum of £3,000, but to

approve the agreement,—that is, to inquire into the circumstances under which the agreement was made,—and that otherwise their position in court would be as if no agreement were made. There was no disagreement between the parties as to what service was to be rendered, or as to the place to which the Leipsic was to be towed. The Gresham was to tow the Leipsic, and was to tow her to Sandy Hook. The only dispute was as to the compensation. The captain of the Gresham wanted more than £3,000. The captain of the Leipsic insisted on less than £4,000. The captain of the Gresham came down to £3,000. The captain of the Leipsic refused to make the agreement unless the added words should be added, because he thought £3,000 too high. Under these circumstances, the words "prove the said agreement" can mean nothing except "approve the said agreement for £3,000 as to its amount." That being so, the court is at liberty to inquire whether the £3,000 is a sum which would be awarded if there were no agreement.

On the facts of this case I think this was a salvage service. Unable to use her steam machinery, it not appearing that it could be repaired at sea, having rejected offered assistance from a steamer, neglecting to signal passing steamers, keeping this up until the 12th, ordering rocket signals to steamers that night, hailing the bark on the 12th to report her with a broken draft, the Leipsic induced the Gresham to go back 40 miles to find her. She was drifting northeasterly in the current of the gulf stream, which was a direction in which she did not want to go. She was under sail for seven days. In six days she had sailed but 216 miles. She was still 125 miles from Sandy Hook, and approaching the coast near the equinoctial season. Within the rule laid down in *The Princess Alice*, 3 W. Rob. 138, there was here certainly something more than employment to expedite a voyage,—something more than accelerating the progress of the Leipsic. She was to be taken to a port to which she was not destined to repair her disabled machinery. In *The Reward*, 1 W. Rob. 174, it was said:

"Mere towage service is confined to vessels that have received no injury or damage;" and "mere towage reward is payable in those cases only where the vessel receiving the service is in the same condition she would ordinarily be in without having encountered any damage or accident."

The law as laid down in *The Princess Alice* was approved by the privy council in *The Strathmore*, L. R. 1 App. Cas., 58. The cases of *The Reward* and *The Princess Alice* were cases of assistance by steam-tugs to sailing-vessels. In *The Jubilee*, 42 Law Times Rep.

(N. S.) 594, a steamer which carried fore and aft sails only, and was not rigged for proceeding under sail alone, had broken the main shaft of her propeller. She put up signals of distress, and was towed by another steamer 40 miles into a port to which she was not bound. It was urged that she was making fair progress towards a safe port by means of her sails, under no circumstances of danger. The question arose directly whether the service was salvage or towage, because the towed steamer had paid to the other a sum for the service, and the crew of the towing steamer put in a claim for a share in the money as salvage to be distributed. The owners desired to retain the whole, as towage money only. Sir Robert Phillmore held that the case was one of salvage and not of towage only, and gave to the crew a share of the money. Citing the case of *The Princess Alice,* he said:

"I think in this case the circumstances show that something more was required than expedition, and something more than mere acceleration of progress. Here was a vessel lying with her main shaft broken. The great difficulty of a screw steamer is invariably when her shaft is broken. In this case she put up two flags for assistance. I am satisfied that the principle is laid down in many cases that, under these circumstances, flags are put up on the ship for the purpose of obtaining salvage service. The service, therefore, in this case was one of a salvage character."

In the present case the Leipsic did what was equivalent to putting up flags for assistance or signals of distress by sending by the bark the message she did, and by ordering rocket signals to steamers on the night of the 12th, and by her signal to the Gresham when the latter came in sight. The present case is not at all like that of *The Emily B. Souder,* 15 Blatchf. 185. In that case it was held that there was mere expedition by towage in order to deliver passengers sooner at the port to which the towed and the towing steamer were both of them bound; and the master of the towing steamer neither did nor said anything at the time to indicate that he regarded the case as one of salvage. In the present case, asking even £3,000 for towing a distance of 125 miles was a clear indication of a claim to a salvage service.

The case is one of a *quantum meruit,* for salvage. The value of the Leipsic, cargo, and freight was over $264,000. The value of the Gresham was $90,000. In regard to the Leipsic there are these facts: She had lost the use of her steam-power; with the sails she had, and such winds as she had had, she would, at her prior rate of sailing, have been between three and four days in reaching Sandy Hook; she

was in the gulf stream, drifting north-easterly when it was calm; she was in good condition except as to her steam-power; she had tried sailing and had determined to abandon it, and was seeking assistance from steamers; delay had become serious, and her captain took the services of the Gresham, though he knew it would be under a claim for £3,000, rather than let the Gresham go, and trust to the other steamer in sight or to some other resource. In regard to the Gresham, she put back 40 miles, and went out of her way to a port to which she was not bound; she was delayed in all 48 hours; she had a charter to begin at Baltimore the 25th, which she might have lost; and the service was, in fact, not difficult or dangerous. I think the £3,000 is entirely too much. At the same time I think the $3,750 is not enough. I award the sum of $5,500. Of this the Gresham is to have three-fourths, or $4,125. This is peculiarly a case where her owners ought to have a large share. Of the remaining $1,375, the master of the Gresham is to have $150, and the rest is to be divided among her master, officers, and crew, in proportion to the rates of their respective wages.

The district court awarded costs in that court to the libellants, as the claimant had made no tender. This was correct. As both parties have appealed, and each has had partial success, no costs in this court are allowed to either party.

NOTE. That towage is a salvage service, see *The Leipsic*, 5 FED. REP. 108; *The Ellora*, 1 Lush. 550. The compensation for salvage services, as salvage, should be sufficiently large to make every one concerned sufficiently eager to perform the service promptly. *Ehrman* v. *The Steam-ship Swiftsure*, 4 FED. REP. 463; *The Emily B. Souder*, 15 Blatchf. 185. The compensation should be just, (*The Mary E. Long*, 7 FED. REP. 364,) adequate, and liberal, (*Atlas Steam-ship Co.* v. *The Steam-ship Colon*, 4 FED. REP. 469,) and a proper reward. *The Bark Loveland*, 5 FED. REP. 105.

There are two elements which enter into the amount of award, viz., adequacy of remuneration and a bounty given to encourage such services. *The Sandringham*, ante, p. 556.

Agreements for compensation made at sea are subject to the approval of the court, (*The Leipsic*, 5 FED. REP. 108,) and an agreement to pay excessive salvage will not be enforced. *Brooks* v. *The Steamer Adirondack*, 2 FED. REP. 387.—[ED.

Where an ordinary towage service is commenced at an agreed sum, and an extraordinary service is rendered, the agreement may be set aside.(*j*) So, if the agreement be exorbitant, the court will not enforce it.(*k*) Where there is an agreement for an extra compensation the court will not increase the sum agreed upon because of some additional assistance rendered,(*l*) unless some material circumstance has been concealed;(*m*) but the concealment must be purposed, and the circumstance must be of importance.(*n*)

Agreements for compensation made at sea are subject to the approval of the court,(*o*) and an agreement to pay excessive salvage will not be enforced.(*p*)—[ED.

(*j*) The William Brandt, 2 Notes of Cas. Supp. lxvii; and see The Albion, Lush. 282; The Saratoga, Id. 318; The Minnehaha, Id. 335; The Annapolis, Id. 355; The Lady Egidia, Id. 513; The Edward Hawkins, Id. 515; The Pericles, Brown & L. 80; The White Star, L. R. 1 Adm. Ec. 68; The Galatea, Swab. 349.

(*k*) The Jacob E. Ridgway, 8 Ben. 179; Two Hundred and Two Tons of Coal, 7 Ben. 343; The Steamer Adirondack, 2 Fed. Rep. 387. See The Leipsic, 5 Fed. Rep. 109.

(*l*) The Betsey, 2 W. Rob. 167.

(*m*) The Kingalock, 1 Spinks, 263.

(*n*) The Jonge Andries, Swab. 226, 303.

(*o*) The Leipsic, 5 Fed. Rep. 108.

(*p*) Brooks v. The Steamer Adirondack, 2 Fed. Rep. 387.