## THE PHOENIX.

### PARSONS et al. v. ROCKWELL.

(Circuit Court of Appeals, Fourth Circuit. May 22, 1894.)

#### No. 68.

SALVAGE—COMPENSATION—REVIEW ON APPEAL.

A steamship, worth, with her cargo, about $160,000, was disabled by the breaking of her shaft, far out at sea, and after drifting under sail several days, changing position but little, was taken in tow by another steamer, valued at $125,000, whose cargo was worth $400,000, and whose freight and passage money amounted to $13,000. No unusual trouble occurred, and no unusual risk was involved in the towage, and the only storm encountered arose on the fourth day, when the vessels were anchored in a place of comparative safety; and, on the next day the towage was completed. *Held*, that an award of $35,000 was excessive, and should be reduced to $20,000.

Appeal from the District Court of the United States for the Eastern District of Virginia.

This was a libel by Cyrus O. Rockwell, master of the steamship Saginaw, against the steamship Phoenix, John J. Parsons and Thomas Linton, claimants, for salvage. The district court rendered a decree for libelant. Claimants appealed.

The decision of the district court, rendered by HUGHES, District Judge, was as follows:

#### Statement of the Case by the Court.

The British steamship Phoenix (Philliskirk, master) left Macio, Brazil, on the 19th of January, 1893, laden with 2,100 tons of sugar, bound for New York, where the cargo was worth $98,953. The vessel herself was worth not less than $60,000. Her freight money on this cargo was $5,000. She was of two short masts, schooner rig, carrying foresail, square foresail, double topsail, fore and aft foresail, fore staysail, main staysail, and jib. Her tonnage was 1,728 gross; her length, 256 feet; beam, 36 feet; and depth, 18 feet 6 inches. On the 8th day of February her shaft broke square off in the thrust bearing. The steamer was then in longitude 70° 20′, latitude 30° 31′. All sails were set, and the ship headed to the northwest. She proceeded under sails until the afternoon of the 12th, making a total distance in the time of 117 miles. The engineers began an attempt at repairing the broken shaft on the 9th by cutting out the thrust collars, and placing in these two steel plates, on opposite sides of the shaft, fastened with bolts, as is shown by that portion of the shaft itself, which is exhibited in court. They worked at this job continuously from the 9th to the afternoon of the 12th, and now they say they could have completed the two patches and have fastened them in place in four or five hours longer. The job was never completed, and its efficacy was

never shown during the period of a week and more before the arrival of the Phoenix at New York; especially not in the ten or twelve hours of the twelve which elapsed after they had unnecessarily suspended their labors, and before the Phoenix was actually taken in tow by a salvor, at 2 a. m. on the 13th. Previously to the 12th, the Phoenix had put out signals of distress; but only two ships had been seen (both sailing vessels) in the period of four days. She was out of the track of vessels, in unfrequented waters; 'being 150 miles west of the usual track of vessels trading to South American ports, and 150 miles east of the track of those bound to and from the Gulf, San Domingo, and Cuba. Between sundown and midnight of the 12th, the rockets she sent up as signals of distress attracted the attention of the American Clyde steamer Saginaw (Rockwell, master), which was bound from New York to Turk's Island and other West Indian ports. The Saginaw proceeded immediately to the relief of the ship in distress, which proved to be the Phoenix, hailed her, and received her master, Philliskirk, on board, who came alone.

The Saginaw is a freight and passenger steamer, plying between New York and ports of the West Indies on fixed schedule time, in conjunction with one or more other Clyde steamers, which also sail on schedule time, arranged at intervals of ten days or two weeks, as one or two sister steamers of the Saginaw may be put on the line. The Saginaw is a modern iron steamer, with a gross tonnage of 1,800, and length 260 feet. She is valued at $125,-000, and had an assorted cargo, composed in part of perishable goods, and embracing $193,000 of specie, all worth in total value about $400,000, her freight money being $13,000. She had a crew of thirty-nine men, and she had eight passengers.

As to what occurred on the night of the 12th of February, 1893, when the Saginaw responded to the call of the Phoenix upon her for help, the two masters say as follows (I quote from their depositions):

Philliskirk, loquitur: "Q. When he [Rockwell] came up alongside, what happened? A. He asked me if I wanted assistance. I told him, 'Yes.' And the captain said, Well, hadn't I better come on board. I said, 'Very well.' I put the boat out and went on board. Q. After you got aboard, whom did you see? A. I saw the captain [Rockwell]. Of course, he asked what was the matter. I told him the thrust shaft was broken. He asked if I wanted assistance. I said I did. 'Well,' he says, 'captain, I have got a perishable cargo aboard and passengers, and am bound to Turk's Island. I will tow you there.' I said that would not do me at all. Turk's Island is no use to me. I couldn't do anything or get anything there. So, after a little conversation, I said, 'You may tow us up the Chesapeake,—the nearest place.' And he consented to the Chesapeake. Q. You refused to go to Turk's Island? A. Yes. Q. Did you inform him you were making repairs to your shaft? A. No. Q. Was anything said about that? A. Nothing said. Q. Did you inform him of the value of your cargo or freight or vessel? A. No; I don't think I said anything about the value of the cargo. He asked me what I had in her, and I told him sugar; * * * near about 2,100 tons."

Rockwell, loquitur at Norfolk: "About 9 o'clock p. m. of the 12th, we saw signals from the E. S. E. of rockets. We proceeded in that direction about an hour, and found the Phoenix broken down. I hallooed and asked him if he wanted assistance, and he said, 'Yes.' I asked him to come aboard, which he did, and he desired to be towed to the Chesapeake, which I did. Q. When he asked to be towed to the Chesapeake, what proposition did you make to him? A. I objected to towing him to the Chesapeake for several reasons, and offered to tow him to Turk's Island, and then to Bermuda, and he objected strongly to that for several reasons, and wanted to come here very much; and, after thinking the matter all over, I agreed to take hold of him and tow him here if possible; if not, to such safe point as I could. Q. Did he express himself as to any trouble? A. I asked him his trouble, and he said his shaft was broken. I asked him if it could be repaired at all, and he said he could fix it; and I said there was no use of my fooling with him if he could fix it. But he objected strongly to my leaving him, but I told him, if he could repair his ship, I wouldn't want to trouble with him at all. Q. In other words, you were reluctant to undertake the service? A. Unless he was helpless. Q. And you only undertook it on account of his

saying that he was helpless? A. Yes, sir; he insisted upon my helping him into port, and insisted upon coming here to this port." In cross-examination Rockwell says: "Q. I understood you to say, when the captain [Philliskirk] came on board, he made some mention of these repairs? A. I don't remember. He said he had made some repairs, but he said it could be fixed, or words to that effect; and there was some mention made about repairs or fixing. Q. You said that you did not want to take him in tow if that was the case? A. In case he could repair his ship, I didn't want to take hold of him at all, and he objected strongly to my leaving him."

Gerrie, engineer of the Phoenix, loquitur: "It was against my wish for them to take my ship, but, of course, I didn't care about refusing the assistance. Q. You mean by that— A. Of course, I told the captain to take the tow, you know. Q. You did not care about refusing? A. It was against my wish, certainly, for my own part, but still I wouldn't have refused it, you know. The captain asked me, and I told him, 'Certainly, take the ship;' because I did not know what it would have done. I just went on his own judgment."

It may be added here that, previously to the Saginaw's taking hold of the Phoenix, her master saw and spoke to no other member of the Phoenix's crew, and there is nothing in the evidence to show, and it is not at all probable, that either Capt. Rockwell or any of his men were on the Phoenix during the whole of this salvage service. Counsel for respondent admit that Capt. Rockwell took hold of the Phoenix for the purpose of securing the salvage award. The Saginaw took hold of the Phoenix and began to make for the Chesapeake about 2 o'clock on the morning of the 13th of February. The chart exhibited in the record shows that the place where the Phoenix was found was in latitude 32° 30', longitude 71° approximately, about 475 miles due east from Charleston, and 360 miles from Chesapeake bay. The towage was done with a steel hawser belonging to the Phoenix, which was put aboard the Saginaw by the men of the Phoenix. It was at no time lost, and did not part. It was hitched to 35 fathoms of chain on the Phoenix, and was connected to the Saginaw by a bridle of manilla hawsers, in order that the line between the vessels should be springy and elastic, to enable the towing to be done without the jerk that would result from having so much dead weight to tow. The manilla hawsers belonged to the Saginaw, and were rendered useless in the progress of the towing by the chafing to which they were subjected by the heavy tow. The whole length of the towing cables and the hawsers forming the bridle was upwards of 250 fathoms, and, if the lengths of the two ships be added, then the length of the whole tow was 336 fathoms, or more than one-third of a mile. The course of the towing lay directly across the Gulf Stream, where heavy fogs are prevalent in February. The fog and the length of the make-up rendered the danger very considerable of colliding with vessels passing north and south along the Gulf Stream across the course of the procession in necessary ignorance of the fact of one vessel being in tow of the other. Except two or three periods of gale, and except the fog, the weather during the towing after the 12th and before the 17th was favorable; but the towing was at all times difficult, and required the utmost care in the navigators of the Saginaw to prevent fouling of the cable with her propeller or rudder during the several intervals when it was necessary to stop or slow down to readjust the bridle on the Saginaw. The sea, as usual in February, was rough, requiring a man to stand constantly aft on the Saginaw to watch the hawsers, which chafed continually, and requiring a man to stand much of the time at the engine-room door to pass orders by word of mouth to the engineer, in order to conform better the speed of the towing vessel to the exigencies of the work in hand and the movements of the ship in tow. Necessarily, there was a great deal of yawing by so large a body as the Phoenix, whose engines were disabled, especially in the early days of the towing. There were fresh gales of wind on the 13th, 14th, and 15th, not of long duration, but putting great strain on the cables; and, during the last days of the service, fog was encountered, rendering it often difficult for the Phoenix to be seen from the Saginaw for hours at the time, and creating much risk of collision with coastwise vessels crossing them in the Gulf Stream. On the 16th the two vessels arrived in the Chesapeake bay, about three miles W. N. W. of Cape

Henry light in Lynnhaven bay, where they had to come to anchor in consequence of the dense fog. The Saginaw lay by the Phoenix, waiting for better weather, until the morning of the 17th, when the Phoenix was again taken in tow with difficulty, while a strong northwesterly gale was prevailing, and at about 4 o'clock p. m. she was finally brought to anchor in Hampton Roads. In approaching the Virginia Capes on the 16th. a dense fog prevailed, which rendered it difficult to get within the Capes without a pilot, and would have made it necessary for almost any other navigator to come to anchor outside, until a pilot could have been procured; but Capt. Rockwell, from his familiarity with those waters, resolved to make his way in. This he did successfully, by diligent sounding, and by cautiously regulating his course by the moan of the Siren buoy off Cape Henry light. His good fortune in this venture, by which he brought the two ships into safe anchorage in Lynnhaven bay on the 16th, secured them from the hazard which would have overtaken them outside from the northeasterly storm which soon after set in and continued for many hours.

The salvage service lasted through all of the 13th, 14th, 15th, 16th, and 17th days of February. Although the weather was, in general, unusually favorable for the season of the year, yet much of it was rugged, and nearly all of the latter part of it was characterized by thick fog, which, as said before, brought much risk to a tow more than one-third of a mile long of being run into by coastwise vessels crossing its course at right angles, unaware of the fact that the two steamers were fettered in their powers to maneuver by a connecting cable. There was constant risk, whenever it became necessary to stop or slow down, of the cable becoming fouled with the propeller of the Saginaw, or else with her rudder. Unusual precautions were taken against this risk by Capt. Rockwell, in having an ample force of men and mechanism ready at hand to keep the slack of the cable promptly hauled in whenever stop or slow down was made. In this matter, and in his entire work during this arduous service, Capt. Rockwell proved himself a seaman of the highest order of skill and efficiency and provident intelligence.

The towing service rendered it necessary for the Saginaw to replenish its store of fuel and provisions at Norfolk. The time lost in the service was rather more than seven days. The towing of so heavy an object as the Phoenix and her 2,100 tons of cargo across the Gulf Stream into Hampton Roads, for so long a distance as 375 miles, and for the protracted period of five days, subjected the Saginaw to much strain, which, though not requiring immediate repairs, entails a necessity for them in the future. Much dissatisfaction was caused to the shippers of freight on the Saginaw by the week's delay in delivering it. Much of the freight destined for her on her return trip in the West Indies which was awaiting her on the wharves had to be stored during the lost week, and other freights sought other conveyances to market. Great loss and inconvenience also resulted to the owners of the Saginaw by the next trips of herself and her companion ship being thrown together; which practically caused the loss of one trip out from the West Indies to one or other of the two ships. The pecuniary losses resulting from these several necessary incidents of the Saginaw's service to the Phoenix are set forth by an estimate filed in the evidence.

In ascertaining the amount proper to be recovered in this action by the libelant, the actual expenses incurred by the Saginaw in the performance of the service must be allowed. The accounts shown by Exhibit G of $570.89 for actual expenses are allowed. I think the evidence shows that the use of the Saginaw and her crew for seven days is worth on the basis of quantum meruit fully $400 a day, or $2,800. Exhibit H, in the libelant's evidence, is an estimate of the incidental and resulting cost to the Saginaw of the deviation and delay which the salvage service caused. I regard it more as an argument for a liberal award than as recoverable eo nomine.

### Comments and Conclusions by the Court.

The interview between the two masters on the Saginaw in the night of the 12th of February was a distinct employment of the Saginaw by the Phoenix, which was helpless, in a salvage service. When something was mentioned about fixing the broken shaft (which was of so little importance that

Capt. Philliskirk entirely forgot it in giving his testimony), Capt. Rockwell at once said: "If you can fix your shaft, I will not fool with you;" whereupon Capt. Philliskirk incontinently dropped the subject, not to be resumed, and insisted upon being assisted to port. The chief engineer of the Phoenix himself, who was the inventor of two flange plates which figure so largely in respondent's evidence, had advised his master to crave assistance and accept it. For four days, while the work in the two small flange plates was in progress, the ship was flying and firing off signals of distress, calling for help. When, at last, rescue came, not one word was said of the 7 by 10 flange plates, not a word to render material the voluminous testimony which has been taken concerning those two pieces of steel and their screws. Although it is now insisted that those patches could have been completed in four or five hours of the 12th, yet work upon them immediately and finally ceased as soon as rescue came. The interview between the two masters was the time and place for these since tediously discussed plates to have been brought into the case; yet Capt. Rockwell heard not a word of them, and it was not until the testimony of the respondent was taken and its answer was filed that they loomed up as the prominent features of the defense. As these plates were not brought to the attention of Capt. Rockwell in the interview of the two masters, and were not mentioned then and there, and as all mention of them was then avoided, the question of the ability of the Phoenix, by completing the patching of the shaft for which these plates were intended, to steam her way into the port of New York, is of very slight materiality in this cause. If Capt. Philliskirk and his several engineers, who all tell the same stereotyped story of ability to complete the repairs in four or five hours, and of confidence in the sufficiency of the two little plates to bring them into port, really believed in that sufficiency, then a deliberate deception was practiced on Capt. Rockwell in concealing from him the grounds of that confidence; and, as to him, the case is the same as if the repairs had never been attempted. That the repairs were in fact puerile is almost apparent from the evidence of the engineers themselves. That a thrust shaft 10 inches in diameter, of solid wrought iron, which had broken square across in a smooth fracture under the strain or pressure or twist which it had to sustain, could be made efficient again in any degree by two steel plates 7 by 10 inches long and wide, and ¾ of an inch thick, bent over the cylindrical shaft, and screwed to it by a few ¾ screws, sunk an inch into the huge shaft, is to me incredible. If the sanguine engineer who devised this method of repairing a solid shaft really believed in its efficiency, his infatuation calls to mind that of the schoolboy who had broken the big blade of his pocketknife in a square fracture, and thought he had made it all right again with two little drops of Spalding's glue. It is not a case for mixed mathematics, but for plain common sense and practical judgment. When a vessel flies signals of distress in midocean in winter weather, and demands and accepts salvage service of a passing ship, and conceals from the salvor the fact of her ability to get to port without help, and then uses the fact of her not being helpless to reduce the salvage service to the grade of mere towage, public policy and every consideration of fair dealing forbid an admiralty court from entertaining such a pretension. The relations between the salvors and the salved in the crisis of peril are too serious for concealments of such a character as I am dealing with. The utmost frankness is demanded of the vessel in peril. A full and complete revelation of all the circumstances of the ship in distress which are not visible to the naked eye is essential. Concealment of any material fact is absolutely intolerable. I will do Capt. Philliskirk and his engineers the justice to say that I do not believe they thought their vessel was otherwise than helpless, or that it really entered into Capt. Philliskirk's thought to deceive Capt. Rockwell in this matter. This pretense of ability to repair the shaft and to get to port with the ship's own engines and sails is an afterthought, resorted to as a means of diminishing as much as possible the reward due for the salvage service, which, by the skill, thoughtfulness, diligence, and good fortune of Capt. Rockwell, was, unexpectedly, so successfully and easily accomplished. The pretension does not commend itself to the favorable consideration of the court, and is rejected. It is rejected—First, because, if the Phoenix was really able to get to port

without help, it was a fraud upon the Sag͏̆͏naw to ask for and to obtain salvage service by concealing this ability; and, second, because, if the ability did not exist, which was doubtless the fact, the pretense of it now is an after-thought, which the court cannot entertain to the prejudice of a meritorious salvor, after an admirably conducted and exceptionally successful salvage service.

Another question, less elaborately discussed in the briefs, is whether a salvor who takes upon himself all risks in entering upon a dangerous service is entitled to reward if the casualties incident to the service do not actually happen. Is the salved alone entitled to the benefit of the nonhappening of expected casualties? If all goes well, and the seas, the winds, and the working of machinery are propitious, is the salvor to sink into a mere tow master, and the salved to be sole beneficiary of the good providence which attended the service? These questions cannot be answered in the affirmative. They are self-refuting. The question assumes a more concrete form, however, when applied to a prominent incident of the service under consideration. The two steamers neared the Capes of Virginia on the 16th February, in a thick fog. Capt. Rockwell did not come to anchor and wait for a pilot, as would have been proper in other vessels, but, trusting to his individual knowledge of those waters, resolved to come on and get inside the Capes at once. This knowledge and the skill he exerted in effecting his purpose gave success to his venture, and the two ships were thus in safe anchorage inside the Capes when the northeasterly storm came on, which soon after set in with great force and violence. The salvage service was still in progress when this storm prevailed. It would possibly have been disastrous to the Phoenix, unable to use her engines, if she had remained outside, waiting for a pilot. She was saved from this danger by the skill and resolution of Capt. Rockwell. A question discussed in the briefs, pro and con, is whether the court may increase its award to Capt. Rockwell for saving the Phoenix from the possible and threatened disaster which was avoided and escaped by having been brought into the Capes before the storm set in. While there are frequently cases in which admiralty courts may refuse to take into consideration storms that have been fortuitously avoided and escaped, yet I think that this case presents circumstances which call urgently upon this court to make up its award with reference in part to Capt. Rockwell's skillful and fortunate conduct in this particular matter.

Summing up the case, I deem this to have been a highly meritorious salvage service. It was rendered in dangerous waters, by a ship embodying values exceeding half a million of dollars, to another ship embodying property worth $160,000. The Phoenix was picked up in the waters off Hatteras, Lookout, and Fear, proverbially a nest and habitat of storms, and was towed for four days through those waters, in a winter month, for a distance of 375 miles, into Hampton Roads. The Phoenix was found in unfrequented waters, moving under sail at the rate of 117 miles in four days, or rather more than a mile an hour, at which rate she was more than 15 days from anchorage, with disabled engines, which constituted an incumbrance rather than a help in those rough seas, presenting a tempting and certain prey to winter storms whenever an evil fortune should bring them upon her. At the distance at which she was found in the waters off Hatteras, she was in a piteously helpless condition with reference to the storms there prevalent and always probable, and in which the two small steel plates so largely discussed in evidence would have been less prominent in the minds of seamen on the ocean than they have been in the minds of witnesses on dry land. The unusual length in miles of this service distinguishes it conspicuously from nearly all the cases cited in the arguments of counsel. The long duration of the risk and the strain of the heavy draft on the salving ship is another distinguishing feature. The length of the salvage expedition, more than one-third of a mile, stretching across the path of ships, made the risk of collision and entanglement unusually great in the long nights and heavy fogs of that season and of those waters. The steam navigator's terror of fouling his propeller was always present. The complete success, without a single accident, and only one day's delay from adverse weather, was a crowning and distinguishing merit of this enterprise. This success is due in chief part to the rare resolution and conscious skill of Capt. Rockwell, but for which

the Phoenix would not have been taken in charge at all in the dangerous region of shipwrecks and storms in which she was found. Salvage services rendered in this region cannot be justly assimilated with such services rendered in other regions of navigation. They will not be undertaken here at all unless under the stimulus of maximum rewards for maximum successes. It was a happy fortune of the Phoenix that fogs and adverse winds had driven the stalwart ship Saginaw, commanded by such a master of the sea as Capt. Rockwell, in her vicinity. Few other men would have taken hold of her at all at the risk of half a million of values; and few other ships would have been stout enough to draw her over so long a distance for so protracted a time, into safe anchorage. The embarrassments which were brought upon his owners and the shippers of the cargo, and on the schedule trips of the steamers of the line to which the Saginaw belonged, by the bold action of Capt. Rockwell, cannot with any justice or propriety be overlooked by the court in fixing the salvage award in this case. I will give a decree for $35,000, and for amount of the account for outlay of $570.89, which has been mentioned.

J. P. Kirlin, for appellants.

Robert M. Hughes, for appellee.

Before GOFF and SIMONTON, Circuit Judges, and JACKSON, District Judge.

JACKSON, District Judge. The master of the steamship Saginaw, on behalf of the owner, filed a libel for salvage, in the circuit court of the United States for the eastern district of Virginia, against the steamship Phoenix. The Saginaw was a passenger and freight steamer plying between the city of New York and divers West India ports. She left New York on her regular trip February 9, 1893, with an assorted cargo worth about $400,000, with a crew of 39 men, and 8 passengers. The value of her trip, including both freight money and the fares of passengers, was about $13,000.

On the night of February 12th, in latitude 32° 35' N., longitude 71° W., the Saginaw was attracted by signals of distress, and, proceeding in the direction of the signals, about 10 miles distant found the British steamer Phoenix disabled with a broken shaft, and requiring assistance. The captains of the two steamers entered into negotiations for the towing of the Phoenix, which resulted in the libelant agreeing to undertake to tow the Phoenix into Chesapeake bay. When the shaft broke, the Phoenix was about 300 miles from the bay, in the open sea; the accident occurred February 8th, and the Saginaw took the Phoenix in tow about 2 o'clock on the morning of the 13th. Between those dates she was under sail and drifted about, changing her position but little. The libelant says, in his testimony, "the weather was generally fair, except at times strong gales and heavy seas." The voyage commenced about 2 o'clock on the morning of the 13th, and during that day the evidence shows that there was a moderate breeze and cloudy weather. On the 14th, the weather was squally, blowing hard at times; the 15th "set in with moderate weather and light breeze blowing" until evening, when it became foggy, which condition prevailed until the vessels came to anchor on the morning of the 16th, and in consequence of the fog, and the violent storms which set in during that night, remained at anchor until about 11 o'clock on the morning of the 17th, when the storm abated and the voyage was resumed, and the

Phoenix towed, without difficulty, into Hampton Roads. A careful examination of the evidence shows that there is but little, if, in fact, any, conflict between the parties to this case as to the character of the weather during the time actually occupied in the towing, and we therefore accept the statement of the master of the Saginaw "that the weather was generally fair, except at times strong gales and heavy seas," which the evidence discloses were of short duration; but his evidence does not, nor does that of any taken upon the part of the libelant, show that there was any unusual or dangerous storm while the vessel was actually in tow. It is not to be denied that there was more or less trouble, as is always the case under such circumstances, in handling the vessel, but it must be admitted that no unusual trouble occurred, nor was there any evidence of any unusual risk taken by the Saginaw. In the language of one of the witnesses, the Phoenix "towed pretty evenly, without jerking." The weather, for the season of the year, was very good, and under its condition there was but little danger or difficulty to be apprehended. But little, if any, hazardous service was encountered; certainly there was no heroic effort required of the salvors in bringing the vessel into the port of safety. Such we find to be the substantial facts of this case, upon which the district court founded its judgment, and awarded the libelant $35,000 salvage.

It is to be observed that the services rendered were not extraordinary nor unusual. No unusual seas were encountered, the vessels had no hurricanes to contend with, nor was the Phoenix, the disabled vessel, close to a dangerous coast, and, as the sequel proved, there never was a well-grounded apprehension of extreme danger. The only storm encountered arose after the vessels were anchored inside of Lynnhaven bay, a place of comparative safety, which continued a day before they were enabled to go into Hampton Roads, where the towage ceased. Although the storm was violent while the steamers remained at anchor, still there is no evidence of any particular peril encountered, or of unusual risk to the vessels. We are asked, under these circumstances, to affirm the judgment of the district court, and many cases have been cited, not only to aid the court in reaching that conclusion, but also to show that courts, in the exercise of sound discretion, in cases of this character, are as a general rule disposed to be liberal in their allowances for compensation, and that a more liberal allowance should be made in cases arising on the south Atlantic coast, for the reason that navigation along it is more dangerous and perilous than on the northern coast. Another reason assigned for the support of this proposition is that there are not near so many vessels passing along that coast, and for this reason the risk to disabled vessels is greater in this part of the ocean.

This brings us to the consideration of the main, if not, in fact, the only, question presented in the record in this case, and that is whether the amount of salvage allowed by the court is excessive. Counsel on behalf of the claimants have referred the court to a number of adjudicated cases as persuasive authorities to show, not only the flexibility of the judicial mind in regard to salvage re-

wards, but to convince it that the allowance in this case is excessive, while the opposing counsel has cited many to sustain it. It is to be remarked that the elements that enter into an estimate are not always found to exist alike, and for this reason the award in each case must depend upon the circumstances surrounding it, and hence "the elasticity of the law of salvage."

From the many cases referred to, we have selected The Alaska, 23 Fed. 597, one of the largest passenger vessels afloat at that day, not only for the reason that the conditions prevailing at the time of her accident, and during her towage, were in many respects similar to those of the Phoenix, but for the additional reason that the allowance made in her case was the largest, under somewhat similar conditions, among the cases cited. She, with her cargo and freight, was valued at $1,041,542, and the Lake Winnipeg, which went to her assistance, was valued, including her cargo, at about $350,000. When found, she was 600 miles from New York, with a broken rudder, having encountered "heavy weather," and had drifted for two days without aid when the Lake Winnipeg observed her signals of distress and took her in tow, arriving in New York on the fourth day of their voyage. During the voyage the weather became "boisterous, with thick snow," the cables which fastened the two steamers together parted, and many other difficulties were encountered. In her case, the character of the weather was much the same as existed in the case of the Phoenix. No supreme danger was encountered by either vessel during their towage, which called for heroic endeavor. The allowance in that case was $9,000 less, though there was nearly, if not, three times as much in value involved.

But it is claimed by counsel for the libelant that this and other cases relied upon by counsel for claimants as persuasive guides for the court in fixing the amount of the allowance are mostly, if not altogether, cases decided by courts on the north Atlantic coast, who are not inclined to be as liberal as courts on the south Atlantic coast, mainly for the reason that they are not called upon to consider cases which arise on that coast, and which to the mariner is one of special danger. Whether or not there exists upon that coast special danger is not a question of fact involved in this case, and cannot, therefore, be considered as an element in fixing the allowance, as the Phoenix was far out at sea, and for this reason we dismiss its further consideration. In our examination of the cases relied upon by counsel for the libelant, where the accidents to vessels have occurred on the south Atlantic coast, we reach the conclusion that the courts on that coast have not been more liberal than the courts on the northern coast, but that in a few instances they have had cases of extreme peril to life and property, which required heroic efforts upon the part of those who went to the assistance and rescue of vessels, that justified liberal allowances. The Akaba, which is relied upon to support the allowance in this case, and which is the strongest one cited, we think rests upon facts that do not exist in this case. The case of the Phoenix is one of meritorious towage, where no such supreme necessity for aid and prompt action existed as in the case of the Akaba. This court, in reviewing that case,

used the following language, which we adopt, showing the extreme peril of the vessel and all on board: "She was found on a dangerous coast, perhaps the most dangerous of American coasts, drifting to leeward, in a heavy northeast gale, almost helpless," with a broken shaft, 10 miles off the coast at Hatteras. "The vessel that went to her rescue had many passengers and a valuable cargo aboard, much of which was perishable, rendered her successful assistance, rescued her from imminent peril, and after great toil and danger towed her to a place of safety." That was a case of supreme necessity, requiring prompt action and great effort upon the part of the crew of the vessel which went to the assistance of the Akaba. In that case, the district court allowed $30,000, which, upon appeal, was approved by this court. 8 U. S. App. 316, 4 C. C. A. 281, and 54 Fed. 197. But that allowance was $5,000 less than in this case, and, as we have seen, under far different circumstances. That is the only reported case we can find on the south Atlantic coast that approximates the allowance in this case. Numerous cases cited in appellants' brief tend to show that this allowance is in excess of the usual amounts for services of this character under similar conditions. Necessarily, no general rule can be laid down to regulate allowances in cases of salvage. The rewards to salvors largely depend upon the merits of their claims in each case. We would not be inclined to interfere with the decree complained of in this case, even if we were of opinion that the allowance was greater than we would have originally made, unless, under all the facts, we reached the conclusion that the allowance was excessive.

In the light of the precedents before us, as well as the fact of the absence of those essential elements in this case that would justify so large an allowance as the district court made, we are of opinion that there should be an abatement of $15,000, reducing it to $20,000, which, we think, under the facts of the case, will be a liberal reward.

The decree of the district court is modified to this extent, and the case is remanded for that purpose, in accordance with this opinion.

### Petition for Rehearing by Appellee.

(June 2, 1894.)

PER CURIAM. We have carefully considered the petition for a rehearing, and the points therefor pressed by the appellee. We see no reason to change the conclusion reached by the court after a full and exhaustive argument upon the merits of the appeal. Whatever ambiguities, if any there be, in the opinion filed, have been removed in the mandate sent down by this court to the district court. In that court, a reapportionment can be made upon the change in the amount of the salvage award, where complete justice can be done to all parties. The prayer of the petition is refused.