## THE FLORENCE.

### THOMAS v. THE FLORENCE.

(District Court, S. D. New York. January 2, 1895.)

SALVAGE—TOWAGE—BROKEN SHAFT—HARTER ACT, FEB. 13, 1893.

The steamship Parkmore, on a voyage from Baltimore to Liverpool, with a cargo in part of cattle, took in tow the steamship Florence, which had broken her main shaft, and towed her to New York, a distance of about 140 miles; actual time of towage 33 hours, the sea being rough, and the Parkmore's hawser once broken. The detention of the Parkmore was between four and five days. The value of the Parkmore and cargo was $460,000, and of the Florence and cargo, $240,000: . Held (1) that $8,500 was a suitable award for the salvage service besides the sum of $1,845.42 for extra expenses; (2) that the provisions of the Harter act of February 13, 1893 (2 Supp. Rev. St. 81), authorizing deviation for salvage without liability to cargo, require less consideration to be given than formerly to the amount of cargo of the salving vessel in fixing the award.

In Admiralty.

Evarts, Choate & Beamen and Treadwell Cleveland, for libelant.
Wing, Shoudy & Putnam, for claimant.

BROWN, District Judge. At about 6 p. m. of Saturday, October 27, 1894, the libelant's steamship Parkmore, bound from Baltimore to Liverpool, went to the assistance of the steamship Florence, in answer to her signals of distress, and thereafter took her in tow and brought her to the harbor of New York, where they arrived off quarantine at 1:20 p. m. of the 29th. The above libel was filed to recover salvage compensation.

The Florence had left New Orleans on October 6th, bound for Bremen, with a cargo of cotton and cotton-seed meal. Meeting with

bad weather, she had subsequently put into Key West, and afterwards coaled at Newport News, which she left on October 22d. On the 24th, at 1:30 p. m., her propeller shaft broke in the stern tube, at a point 7 feet 3 inches from the aft end. She was at that time somewhat out of the course of most ocean steamers; but setting all sail, during the following three days, making about 50 or 60 miles a day on a zigzag course, she had arrived to within about 140 miles of Sandy Hook, when the Parkmore sighted her and took her in tow as above stated. A new Manilla hawser was supplied by the Parkmore, which was once broken during the night in a rough sea, and the towage was necessarily suspended until the morning. The Florence also steered badly, which added somewhat to the difficulty of towage, and the towing bitts on the starboard quarter of the Parkmore were torn away. The actual time of towage was about 33 hours; and the time from sighting the Florence until anchorage in New York, about 44 hours. The whole detention of the Parkmore occasioned by her deviation, was between four and five days. Neither vessel had passengers on board, except that the Parkmore had some cattle men in charge of the 400 cattle that formed a part of her cargo.

The agreed value of the vessels and cargoes were: The Parkmore $175,000, her cargo $285,000; the Florence, in her damaged condition, $70,000, her cargo $170,000; total, Parkmore and cargo, $460,000, the Florence and cargo, $240,000. The extra expenses incurred by the Parkmore, including pilotage, port charges, coal, provisions, feed for cattle, and the injury to her cable and bitts, amounted to $1,845.42. Her ordinary charter demurrage was about $300 per day; and her officers and crew numbered 38.

The general circumstances of the salvage service were not such as to call for very high compensation. Aside from the circumstances above mentioned of the breaking of the cable and the bitts, there were no special circumstances of difficulty or loss; and the work of connecting the cable with the Florence in the rough sea, was mainly done by the men belonging to the Florence.

In fixing the amount of the award in this, as in all other salvage cases, I have endeavored to apply the rule laid down by Mr. Justice Bradley, in the case of The Suliote, 5 Fed. 99, 102, as one of the best expressions of the objects to be kept in view in salvage awards:

"Salvage," he says, "should be regarded in the light of compensation and reward, and not in the light of prize. The latter is more like a gift of fortune conferred without regard to the loss or sufferings of the owner, who is a public enemy, whilst salvage is the reward granted for saving the property of the unfortunate, and should not exceed what is necessary to insure the most prompt, energetic, and daring effort of those who have it in their power to furnish aid and succor. Anything beyond that would be foreign to the principles and purposes of salvage; anything short of it, would not secure its objects. The courts should be liberal, but not extravagant; otherwise, that which is intended as an encouragement to rescue property from destruction may become a temptation to subject it to peril."

See The Alaska, 23 Fed. 597, 613, 614, and cases there cited; The Leipsic, 20 Blatchf. 288, 10 Fed. 585; The Benison, 36 Fed. 793; The Phoenix, 10 C. C. A. 506, 62 Fed. 487. See, also, The New

Orleans, 23 Fed. 909, 911, and Compagnie Commerciale, etc., v. Charente Steamship Co., 9 C. C. A. 292, 60 Fed. 921, 925, as to the encouragement of salvage services through suitable rewards to masters and crews.

I have carefully considered the circumstances urged by counsel, including the possible danger from the wheel, had heavy storms been encountered; and on the other side, the fact that here there were no passengers on either vessel; that the Florence was not wholly helpless, but under sail, and was getting so near Sandy Hook that abundant other help would soon have been offered her; and also the further circumstance that since the passage of the Harter act of February 13, 1893 (2 Supp. Rev. St. 81), a vessel is authorized to deviate for the purposes of salvage, without incurring any responsibility to cargo for so doing; so that less consideration than formerly is now to be given to the value of the cargo of the salving vessel.

Taking all the circumstances into view, my conclusion is that the sum of $8,500 will be a suitable award, besides the sum of $1,845.42 for extra expenses, as above stated, which sums are accordingly allowed.    Of the sum first named four-fifths will be awarded to the owners, and but one-fifth to the officers and crew, from the fact that the additional labor imposed on them was comparatively small. From the latter sum, $500 is awarded to the master, and $150 to the chief engineer; and the residue of the one-fifth to the other officers and to the crew in proportion to their wages.    Decree accordingly, with costs.