## THE R. R. RHODES.

### THE R. R. RHODES v. FAY.

#### (Circuit Court of Appeals, Sixth Circuit. October 5, 1897.)

#### No. 453.

1. SALVAGE—AMOUNT OF COMPENSATION—REVIEW ON APPEAL.
   The allowance of salvage is an act involving judicial discretion, and the award will not be set aside as too large unless so excessive as to shock the conscience of the appellate court.

2. SAME.
   An award of $3,500 to a Lake steamer, worth, with her cargo, $40,000, for drawing off with some danger to herself another steamer, worth about $70,000, from rocks upon which she had gone fast, and was in a very dangerous position, *held* not excessive; the salving steamer having been detained about 16 hours on her voyage.

3. SAME—ELEMENTS DETERMINING COMPENSATION—SUBSEQUENT STORM.
   In a suit for salvage for rescuing a stranded vessel from a reef where she would have been in great danger in a storm, evidence that a severe storm did in fact occur within a short time after the rescue is not entirely irrelevant, as it illustrates the imperative necessity the stranded vessel was in of losing no time in getting off.

4. SAME—CONTRACT FOR SERVICE.
   A mere request for aid made by the master of a vessel in distress to the master of another vessel does not prevent the service rendered from being a salvage service, or reduce the claim merely to one for services rendered under a contract.

Appeal from the District Court of the United States for the Western District of Michigan.

On the night of Saturday, the 11th of August, 1894, about 11 o'clock, the steamer R. R. Rhodes, laden with a cargo of 1,827 tons of iron ore, while going at her full speed of 9½ miles an hour, ran upon a rocky reef off the north end of the South Fox Island, in Lake Michigan. She remained fast, and at her bow drew 15 inches of water less than before she was stranded. Her keel

and planking were so injured that, after she was towed into Chicago, it cost over $4,000 to repair them. The reef was from three-quarters of a mile to two miles from shore, and the navigation in its vicinity was dangerous, because, while the water was deep enough in places, there were many bowlders on the bottom, ranging from those of a small size to others of many feet in circumference. As soon as the master ascertained her condition, he got an anchor out lakeward to prevent the steamer from drifting further on to the rocks and the shore, and the crew was immediately set to work jettisoning the cargo. On Sunday morning, the 12th of August, the mate was sent in a small boat to the nearest point of land, whence, by a sailing vessel, chartered for the purpose, he proceeded to Northport, 28 miles distant, where he telegraphed for the assistance of a wrecking steamer at Mackinac, 100 miles distant. About 3 o'clock on Sunday afternoon, the steamer Westcott, bound from Escanaba to Elk Rapids, sighted the Rhodes 8 miles away, changed her course, and, running towards her, discovered her condition. The master of the Rhodes, who had signaled the Westcott as she came nearer, requested her to render assistance. The Rhodes had no towlines, and the Westcott used a comparatively new one of her own, 9 inches in thickness and 700 feet in length. The Westcott stopped about 1,000 feet distant from the Rhodes. The Rhodes' master then came out in a small boat, and persuaded the master of the Westcott that she might safely approach the Rhodes, and that there was water enough on the starboard side of the Rhodes to permit her to go alongside. For two hours the Westcott attempted to swing the Rhodes off the rocks by the use of the towline, but did not succeed. She then went alongside the Rhodes, and sent aboard the Rhodes half her crew to assist in lightering. This was necessary, because the crew of the Rhodes were very tired from the hard labor of the previous night and day. After about 100 tons had been lightered, the Westcott again gave the Rhodes the towline, and, after two hours of hard work, succeeded in pulling or swinging her off the reef. The Rhodes kept her machinery moving. When the Rhodes had been pulled from the reef, it was discovered that she had broken off the buckets or blades of her screw, leaving nothing but a round hub, with which she was able to make no progress through the water. In her helpless condition, it became necessary for the Westcott to tow her from the reef to Northport, 28 miles away. The work of pulling the Rhodes off the reef and towing her to Northport delayed the Westcott in reaching her destination at Elk Rapids about 16 hours. The Westcott was a vessel 187 feet long, 32 feet beam, and having a cargo at the time of this occurrence of about 750 tons of iron ore, and worth, hull and cargo, $40,000. She drew a little more than 14 feet. The draft of the Rhodes was 15 feet 2 inches forward, and 15 feet 5 inches aft. She was 50 or 60 feet on the reef, about amidships. The lake was calm at the time of the stranding, but the air was filled with smoke from forest fires; and though it cleared sufficiently to enable the Westcott to see the Rhodes on the afternoon of Sunday, the 12th, the air continued smoky until Northport was reached, on Monday morning, about 8 o'clock. The place where the Rhodes ran aground was off the usual course of steamers some 3 or 4 miles. It was near the middle passage frequented only by steamers going across Lake Michigan from Escanaba to Elk Rapids, and was out of view of the passage through which the great majority of the Lake steamers passed. The men upon the Rhodes had descried a steamer of the Anchor Line a little earlier in the afternoon, some three or four miles away, which failed to hear, or, at all events, failed to respond to, the Rhodes' signals of distress. On Tuesday morning, a northwest wind, reaching the proportions of a gale, came up, which probably would have rendered the Rhodes a total loss had she still been upon the reef. It was contended by the counsel for the Rhodes that the reason why more vessels were not seen from Saturday night, after she stranded, until Sunday afternoon, was because the smoke prevented, and not because the vessels were not frequently passing within a reasonable distance of the reef. After the Rhodes reached Northport, she was towed by the Marquette from Northport to Chicago, the Marquette delaying the trip until after the gale of Tuesday abated. The towline of the Westcott was very much weakened and its value much lessened by the strain to which it was necessary to subject it in jerking the Rhodes off the reef. There was no written opinion delivered by Judge Severens, who heard the case in the district court, but he entered a decree in favor

of J. J. Fay, Jr., for salvage of $3.500. The estimates of the value of the Rhodes varied from $60,000 to $85,000 and upward. It is suggested by counsel that the court below fixed the value at $70,000, and the salvage at 5 per cent. thereof.

Harvey D. Goulder (S. H. Holding, of counsel), for appellant.

C. E. Kremer, for appellee.

Before TAFT and LURTON, Circuit Judges, and SAGE, District Judge.

TAFT, Circuit Judge (after stating the facts). We do not think that we ought to disturb the decree of the district court in this case. The action of the court in allowing salvage is one involving judicial discretion, and an appellate court will not set aside the result of the exercise of that discretion by the trial court unless it has been manifestly abused,—unless, as Chief Justice Marshall expresses it, in The Sybil, 4 Wheat. 98, the award of the district court is so grossly excessive as to shock the conscience of the appellate court. The Comanche, 8 Wall. 448; Hobart v. Drogan, 10 Pet. 108; The Phoenix, 8 U. S. App. 626, 10 C. C. A. 506, and 62 Fed. 487; The Connemara, 108 U. S. 359, 2 Sup. Ct. 754; The Florence, 38 U. S. App. 32, 18 C. C. A. 240, and 71 Fed. 527. The only point for discussion in the case, therefore, is whether the allowance by the court below was grossly excessive, and not whether, if we had been sitting in the trial court, we would have fixed a somewhat less amount.

There was ample evidence to justify the court in finding that the situation of the Rhodes was perilous. The record does not disclose the exact length of the Rhodes, but it is apparent that considerably less than one-third of the vessel was grounded upon the reef, and that this was about amidships. The witnesses for the libelant testify that she was hogged or bent so that her bow and stern sagged below her middle. Whether this be true or not, it is certain that, as she lay there, a heavy wind from the northwest would have destroyed her. It is also apparent that, in the thick and smoky condition of the atmosphere, the prospect of being relieved by other vessels was by no means bright. It is true that a telegram had been sent to a point 100 miles away for the wrecking steamer, but this could not have been done until the afternoon of Sunday, and it does not appear whether such a steamer was to be had. With all the effort which was made by the crews of both vessels to lighter the Rhodes, they succeeded in throwing overboard but 100 tons of the ore in something less than 24 hours. It is not at all clear that, if they had been dependent upon getting the steamer off by lightering her, they would have succeeded in doing so before Tuesday's storm was upon them. It is true that it was in a season of the year in which storms were not usual; but it is also true that storms sometimes occurred at that season, as the storm of Tuesday abundantly proved, and that they are not so exceptional at that time as to justify excluding them from a mariner's calculation when their occurrence would have been so disastrous as in this case. It is to be noted that it did not need a dangerous storm to imperil the hull and cargo of the Rhodes in her then condition. It needed only a heavy wind, as the captain of the

Rhodes, in his evidence, fully admits. So much for the peril which the Rhodes was in.

The Rhodes was upon a dangerous reef. Navigation in that vicinity by the Westcott, loaded with iron ore, drawing 14 feet, backing, maneuvering, and running ahead at full speed, as she was obliged to in order to accomplish the release of the Rhodes, was not by any means free from danger to herself. We think it very probable that nothing but the prospect of a substantial reward would have induced the captain of the Westcott to run the risks which he certainly did run in going to the relief of the Rhodes. The Westcott and her cargo were worth about $40,000. The presence of the bowlders upon the bottom of the lake and on and about the reef is abundantly established by the evidence. It also appears that in her maneuvers the Westcott actually did touch bottom several times, if the testimony of two or three of her witnesses is to be credited. In this state of the record, while we might, perhaps, have fixed a lower amount were this the original hearing, we are clearly of opinion that in the hearing upon appeal we should not do so. It is suggested that the amount allowed as salvage to the Westcott is nearly or quite as much as the profits she would have earned in an entire season. This may be true, but we do not see why this circumstance should change the allowance if, as the court must have found, in order to earn this salvage, she put herself and her cargo in jeopardy.

An exception was taken to the libel in its mention of the storm which took place on Tuesday. We think this exception was not well taken. It was conceded that the condition of the Rhodes would have been practically hopeless had the storm found her on the reef, and the reference to it in the libel and the consideration of it by the court were justified as illustrating the very imperative necessity she was under of losing no time in getting out of her predicament. Such a storm was considered in The Neto and Cargo, 15 Fed. 819, and was thought not to be of particular weight in the case of The Emulous, 1 Sumn. 207, Fed. Cas. No. 4,480; but we do not understand that the court held in the latter case that the evidence was entirely irrelevant. The storm certainly showed that such a change in the weather was not impossible at that season.

The main ingredients to assist the court in determining the amount of salvage are stated by the supreme court of the United States, speaking by Justice Clifford, in the case of The Blackwall, 10 Wall. 1, 14, as follows:

(1) The labor expended by the salvors in rendering the salvage service. (2) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4) The risk incurred by the salvors in securing the property from the impending peril. (5) The value of the property saved. (6) The degree of danger from which the property was rescued.

Having due regard to such of these factors as were present in this case, we cannot find the allowance excessive.

Something has been said by counsel in argument and in the brief indicating a desire to have this court establish a rule for fixing sal-

vage upon the Lakes different from that which obtains upon the high seas; and reference was made to a decision by Judge Baxter, in Mattingly v. Cotton, 2 Flip. 288, Fed. Cas. No. 9,294, in which he points out the great differences between cases of salvage upon the Western rivers and those upon the high seas. The difference recognized is a mere absence from cases of salvage on the rivers of some of the factors which increase the amount of the salvage on the high seas. It is quite certain that the dangers of salvors upon the Lakes are more like the dangers upon the high seas than those upon the Western rivers; but we do not think it profitable to attempt to lay down any general rule distinguishing salvage upon the Lakes from that on the high seas. Each case must be determined by its own circumstances. In the present case we hold that the court might reasonably have found impending peril for the steamer salved, and real danger to the steamer and cargo of the salvor, and that the amount allowed by the court below was not so manifestly excessive as to justify us in disturbing it.

Another point made by the counsel for the appellant is that there was a contract for services made between the captain of the Rhodes and the captain of the Westcott, and that this should not be treated as a salvage case, but only as a suit for services upon a contract. The evidence does not bear out this claim. The language upon which it is based was the mere request for aid by the captain of the stranded vessel to the captain of the vessel then about to aid her. A mere request for aid, without any discussion as to terms, certainly cannot exclude the right to salvage. If so, then all signals of distress must exclude it, for they are certainly requests for aid. The decree of the district court is affirmed.